CITY OF SCRANTON

v.

**E.B. JERMYN LODGE NO. 2 OF the FRATERNAL ORDER OF POLICE, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2008.

Decided Feb. 6, 2009.

Thomas W. Jennings and Stephen J. Holroyd, Philadelphia, for designated appellant, E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police.

Richard M. Goldberg, Kingston, Clifford B. Levine, Pittsburgh, and W. Timothy Barry, Pittsburgh, for appellee, City of Scranton.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, FRIEDMAN, Judge,[1] COHN JUBELIRER, Judge, SIMPSON, Judge, LEAVITT, Judge and BUTLER, Judge.

OPINION BY Judge SIMPSON.

## Table of Contents

| | | |
|---|---|---|
| I. | Background | 361 |
| II. | Arbitration Award | 362 |
| III. | Petition to Vacate or Modify | 363 |
| IV. | Issues on Appeal | 363 |
| | A. Section 252 of Act | 364 |
| | B. Judicial Review | 366 |
| |    1. Scope and Standard of Review | 366 |
| |    2. Available Remedies | 366 |
| | C. Unlawful Act | 367 |
| |    1. Amendment of Recovery Plan | 367 |
| |    2. Terms of Award | 368 |
| |       a. Expiration of Recovery Plan | 368 |
| |       b. Wages | 369 |
| |       c. Health Care | 370 |
| |       d. Police Department Administration | 372 |
| |          i. Provisions of Award, Recovery Plan | 372 |
| |          ii. Contentions | 375 |
| |          iii. SIT Agreement, Management Rights | 375 |
| |          iv. Minimum Manning | 376 |
| |       e. Other Provisions of Recovery Plan Not Adopted | 376 |
| |    3. Waiver by Failure to Raise Arguments | 378 |
| | D. Illegality of Recovery Plan | 378 |
| |    1. State Adverse Interest Act | 378 |
| |    2. Recovery Plan Conflict with Act 111 | 379 |
| | E. Preclusion by Conduct | 380 |
| V. | Conclusion | 380 |

These appeals originating in an interest arbitration award involving public safety employees of a distressed municipality require this Court to again examine the effect of the Municipalities Financial Recov-

---

1. The decision in this case was reached before January 1, 2009, when Judge Friedman assumed the status of senior judge.

ery Act (Act 47)[2] on collective bargaining rights under the statute known as the Policemen and Firemen Collective Bargaining Act (Act 111).[3]

In particular, the E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police (FOP) appeals from two orders of the Court of Common pleas of Lackawanna County (common pleas court),[4] in favor of the City of Scranton (City) and its allied intervenors.[5] The first order, entered October 23, 2007, vacated unspecified provisions of an interest arbitration award between the FOP and the City because the award violated the City's 2002 Recovery Plan enacted under Act 47. The second order, entered January 15, 2008, attempted to clarify the first order by generally modifying the arbitration award "to incorporate the terms of the [2002] Recovery Plan, until the Recovery Plan is amended or the [City's] designation as 'distressed' under Act 47 is removed." Reproduced Record (R.R.) at 19a.

## I. Background

The largely uncontested history of this vigorous collective bargaining litigation has roots in 1992, when the City was determined to be financially distressed under Act 47. The Commonwealth of Pennsylvania, Department of Community and Economic Development (DCED) appointed an Act 47 Coordinator for the City. The Coordinator developed several financial recovery plans for the City. The third and most recent recovery plan was adopted in 2002 (2002 Recovery Plan), and it was overwhelmingly approved by referendum. The

City remains a financially distressed municipality, and it continues to operate under Act 47 and the 2002 Recovery Plan.

Chapter I–B of the 2002 Recovery Plan is titled "CURRENT AND PROJECTED FINANCIAL OUTLOOK." It contains detailed estimates for essentially flat revenues and increasing expenditures from 2002 through 2007 under the prior administrations. The Plan concludes that in the absence of corrective action, the City faces sizeable and growing deficits, resulting in a cumulative deficit in 2007 of $7.21 million. R.R. at 71a.

Chapter II–A of the 2002 Recovery Plan is titled "OVERVIEW OF REVISED AND UPDATED RECOVERY PLAN FOR 2002, 2003, 2004, 2005, AND BEYOND." In this chapter the Act 47 Coordinator offers an overview of planned corrective action "for the period 2002, 2003, 2004, 2005 and beyond." R.R. at 165a. It contains detailed estimates of revenues and expenditures for 2003 through 2005 based on compliance with the 2002 Recovery Plan, resulting in no deficits.

Chapter II–B of the 2002 Recovery Plan is titled "LABOR RELATIONS, COST CONTAINMENT, AND RELATED PROVISIONS." It sets forth specific requirements for the City's employees. This section of the 2002 Recovery Plan states in part:

> However, to the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that the

---

2. Act of July 10, 1987, P.L. 246, *as amended*, 53 P.S. §§ 11701.101–11701.501.

3. Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1–217.10.

4. The Honorable Harold A. Thomson, S.J. of Pike County, sat by designation.

5. The Commonwealth of Pennsylvania, Department of Community and Economic Development and the Act 47 Coordinator for the City of Scranton intervened before the common pleas court.

*implementation of these cost contain-
ment provisions is mandatory. All
costs containment provisions must be
addressed.* The only exception to the
mandatory intent and nature of these
provisions will be by amendment to said
provisions, based upon approval from
the Coordinator, in conjunction with the
Pennsylvania Department of Community
and Economic Development. Any such
change must be in conformance with the
financial parameters of the Recovery
Plan.

R.R. at 184a (emphasis added). The chap-
ter contains mandatory provisions applying
to all City employees, R.R. at 184a–91a,
provisions specifically for the fire employ-
ees, R.R. at 191a–94a, provisions specifical-
ly for the police, R.R. at 194a–99a, and
provisions specifically for other employees.

## II. Arbitration Award

Pursuant to Act 111, the City and the
FOP operate under a collective bargaining
agreement (CBA). The last CBA expired
as of December 31, 2002. Because collec-
tive bargaining for a new CBA reached an
impasse, a panel of arbitrators was select-
ed to render an arbitration award that
would establish the terms and conditions
of employment for police personnel. A
similar panel was selected to establish the
terms and conditions for fire fighters.

After extensive hearings throughout
2003 and 2004, at which the impact of Act
47 and the 2002 Recovery Plan was hotly
contested, and after more extensive delib-
erations, a divided arbitration panel issued
an award regarding the FOP on April 7,
2006.[6] The award covered the period Jan-
uary 1, 2003 through December 31, 2007.

In the award, the panel majority ac-
knowledged the City's status under the
2002 Recovery Plan. Nevertheless, the ma-
jority stated, "This Award is intended to
reflect the intent of the Recovery Plan
even though the recommendations will not
be followed to the letter." R.R. at 23a.
The majority concluded a certain amount
of flexibility is contemplated; otherwise, a
municipality subject to Act 47 can reach
impasse and impose terms without the pro-
cesses afforded by Act 111. The panel
majority's solution to this problem was for
the municipality to amend the Recovery
Plan to coincide with the specific provi-
sions of an interest arbitration award.
R.R. at 24a. With regard to the Recovery
Plan's contemplation of broad management
rights, the panel majority stated that the
City's obligation to work with the FOP in
resolving reorganization and health care
cost accounting issues should not be writ-
ten out of the CBA. *Id.*

As to wages, the panel majority awarded
retroactive lump sum bonuses to all bar-
gaining unit members of $1000 for 2003,
$1250 for 2004, $1500 for 2005, a salary
increase of 5.5% as of the last day of 2005,
a salary increase of 3.5% for 2006, and a
salary increase of 4% for 2007. R.R. at
25a. Further, the majority adjusted
health insurance deductibles and provided
health benefits to officers retiring after
January 1, 2007 for five years. R.R. at
25a–27a.

Separately, the panel majority ad-
dressed the administration of the police
department in general and the Strategic
Implementation Team Agreement with the
FOP in particular. R.R. at 27a–30a. The
majority allowed 10 hour shifts, modified
manning schedules, and addressed assign-
ment of detectives, drug and alcohol test-
ing.

---

6. The award was not dated, and it was signed
by the three arbitrators on different dates.
On April 7, 2006, the independent arbitrator
signed the award, comprising a majority of
the panel with the FOP's arbitrator.

Finally, the panel majority determined that all other proposals for change submitted by the City and the FOP which were not expressly addressed were nevertheless considered and denied. R.R. at 30a.[7]

## III. Petition to Vacate or Modify

The City filed a petition to vacate or modify the award with the common pleas court. The FOP answered and raised new matter. At about the same time, the City filed a similar petition with regard to the parallel arbitration involving its fire fighters. The common pleas court handled both petitions together. The court permitted intervention by DCED and the Act 47 Coordinator. After argument on both arbitration awards, and after deliberation, the common pleas court issued its first order, which vacated both arbitration awards.

The common pleas court summarized the positions of the parties, and it reviewed cases addressing the interplay between Act 47 and Act 111 collective bargaining.[8] Ultimately, the court concluded the awards violated the 2002 Recovery Plan, and it generally vacated those award provisions, although the violations were not detailed. The court also rejected the FOP's argument that any violations of the 2002 Recovery Plan could be cured by plan amendment. The court concluded that under Section 249 of Act 47, 53 P.S. § 11701.249, the City cannot unilaterally amend the 2002 Recovery Plan; rather, the Act 47 Coordinator must initiate an amendment. To the extent the award required the City to amend the 2002 Recovery Plan, the award required the employer to perform an illegal act.

Thereafter, the City sought clarification of the first order. In response, the common pleas court issued its second order generally modifying the awards "to incorporate the terms of the [2002] Recovery Plan, until [the Plan] is amended or the [City's] designation as 'distressed' under Act 47 is removed." R.R. at 19a.

## IV. Issues on Appeal

The FOP appealed from each of the two common pleas court orders. Although Section 7(a) of Act 111, 43 P.S. § 217.7(a), states that no appeal shall be allowed to any court from the determination of a board of arbitration, courts have limited jurisdiction, in the form of narrow *certiorari*, to review arbitration awards. *City of Scranton v. Fire Fighters Local Union No. 60*, 923 A.2d 545 (Pa.Cmwlth. 2007) (similar contentions about grievance arbitration award based on CBA executed before 2002 Recovery Plan adopted). Thus, our review is limited to questions concerning: (1) the arbitrators' jurisdiction; (2) the regularity of the proceedings; (3) an excess of the arbitrators' powers; and (4) deprivation of constitutional rights. *Id.* An arbitrator who mandates that an illegal act be carried out exceeds his or her powers. *Id.*

The FOP assigns six primary errors in its main brief: 1) Section 252 of Act 47, 53 P.S. § 11701.252, does not by its terms

---

7. There was a dissenting opinion from the City's arbitrator (dissenting to the award in general as violating the 2002 Recovery Plan). R.R. at 32a–33a.

8. *City of Farrell v. Fraternal Order of Police Lodge No. 34*, 538 Pa. 75, 645 A.2d 1294 (1994) (Act 47 prohibits clear, specific recommendations of recovery plan from being violated, expanded or diminished); *Wilkinsburg Police Officers Ass'n v. Commonwealth*, 535 Pa. 425, 636 A.2d 134 (1993) (restrictions on collective bargaining embodied in Act 47 are constitutional); *Fraternal Order of Police, Fort Pitt Lodge No. 1 v. Yablonsky*, 867 A.2d 658 (Pa.Cmwlth.2005) (under Act 47, bargaining units continue to be protected by Act 111, but only to the extent that the bargaining does not interfere with the terms of the recovery plan).

apply to interest arbitration awards; 2) the court wandered beyond its narrow review; 3) the court erred by concluding the arbitration award required an unlawful act; 4) the court erred by giving any legal effect to the 2002 Recovery Plan, which is void because the Act 47 Coordinator violated the State Adverse Interest Act;[9] 5) the court erred by giving any legal effect to the 2002 Recovery Plan because by its inconsistent conduct the City is precluded from asserting the Plan against the FOP; 6) rather than vacating the award, the appropriate remedy was remand to the arbitration panel.

In its reply brief, the FOP assigns several more primary errors: 7) the court erred by giving any legal effect to the 2002 Recovery Plan because many provisions are so inconsistent with the statutory right of collective bargaining as to render the entire Plan illegal as a matter of law; 8) Section 252 of Act 47 does not apply to various provisions of the 2002 Recovery Plan which are not economic in nature, so that the arbitration award may properly disregard them; and, 9) many of the City's assertions regarding conflict between the award and the 2002 Recovery Plan were not raised before the arbitrators and are therefore waived.

To the extent possible, we will address related issues together.

## A. Section 252 of Act 47

■ Section 252 of Act 47 provides: "A collective bargaining agreement or arbitration settlement executed after the adoption of a plan shall not in any manner violate, expand or diminish its provisions." 53 P.S. § 11701.252. This provision is a limitation on the statutory rights to collective bargaining by public safety personnel. *Wilkinsburg Police Officers Ass'n v. Commonwealth,* 535 Pa. 425, 636 A.2d 134

(1993). The limitation does not violate the Pennsylvania constitution. *Id.*

The FOP contends this provision does not apply to interest arbitration awards, such as the award in this case. They assert the common pleas court erred when it applied the provision here. More particularly, the FOP argues that by its plain terms Section 252 applies only to CBAs and arbitration settlements after the execution of a recovery plan. Because the provision does not contain the word "award," it should not be construed as applying to awards. It contrasts agreements and settlements, which connote voluntary undertakings, with awards, which arise when the parties fail to reach an agreement. The FOP also points to other labor statutes which specifically address arbitration awards, arguing that the absence of the term here demonstrates the General Assembly's intent that Section 252 not apply to arbitration awards.

In contrast, the City primarily relies on case law addressing Section 252 and specifically rejecting an identical argument. *Pittsburgh Fire Fighters, Local No. 1 ex rel. King v. Yablonsky,* 867 A.2d 666, 671 (Pa.Cmwlth.2005) *(en banc)* (in Section 252 of Act 47, General Assembly was referring to arbitration awards, whether it used the word settlement or determination) *(Fire Fighters v. Yablonsky);* see *City of Farrell v. Fraternal Order of Police Lodge No. 34,* 538 Pa. 75, 645 A.2d 1294 (1994) (after recounting lower courts' decisions referring to Section 252's effect on arbitration awards, Court applied Section 252 to interest arbitration award); *Wilkinsburg,* 535 Pa. at 435, 636 A.2d at 139 (even if section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards, it would not violate the Pennsylvania Constitution); *Fraternal Order of Po-*

9. Act of July 19, 1957, P.L. 1017, *as amended,* 71 P.S. §§ 776.1–776.8.

*lice, Fort Pitt Lodge No. 1 v. Yablonsky,* 867 A.2d 658 (Pa.Cmwlth.2005) (*en banc*) (Section 252 of Act 47 is express limitation on collective bargaining process) (*FOP v. Yablonsky*). Further, noting the General Assembly's failure to amend Section 252 in the 14 years after the Supreme Court's application of it to an interest arbitration award in *City of Farrell,* the City urges a presumption that the decision is consistent with legislative intent.

As to the plain language of Section 252, the City posits that the language is intended to limit the actions of a distressed municipality. Thus, Section 252 makes it unlawful for a distressed municipality to voluntarily violate or diminish an existing recovery plan during collective bargaining. Because an arbitration award may only require a public employer to do that which it could do voluntarily, Section 252 thereby limits arbitration awards even though the word "award" is not present in the text.

In reply, the FOP argues that the purposes of Act 47 do not include the nullification of the duty to bargain under Act 111. Relying on the same cases, the FOP contends that Act 111 is merely limited by Act 47, not erased or overturned by it. Further, the FOP passionately argues that the City's interpretation of Section 252 would allow it to dictate the terms of collective bargaining agreements, a result supported by neither the language of Act 47 nor labor law.

We discern no error in the decision of the common pleas court to apply Section 252 of Act 47 to this interest arbitration award. For the reasons more fully discussed in our recent decision regarding the parallel arbitration involving the City's fire fighters, *City of Scranton v. Fire Fighters Local Union No. 60, of the International Association of Fire Fighters, AFL–CIO,* 964 A.2d 464 (Pa.Cmwlth.2009) we hold that Section 252 of Act 47 applies to interest arbitration awards.

In rebuttal to charts appended to the City's brief detailing numerous failures of the award to include provisions of the 2002 Recovery Plan, the FOP argues that Act 47 was intended to only apply to economic terms of public employment; therefore, several provisions of the Plan which are not economic in nature are not entitled to deference under Section 252. The FOP relies on the legislative intent stated in Act 47, 53 P.S. § 11701.102, and on the criteria for evaluating a municipality's financial stability set forth in Section 241 of Act 47, 53 P.S. § 11701.241. Without identifying the specific provisions of the 2002 Recovery Plan of which they complain, the FOP refers to the requirements that employees submit doctors' notes,[10] changes in the grievance procedures which require more specificity,[11] and requirements that em-

---

**10.** The FOP apparently refers to Section II–B (12) of the 2002 Recovery Plan, titled *"Sick Leave/Doctors['] Evaluation."* The City does not assert that this provision of the Recovery Plan should be added to the FOP award.

**11.** The FOP apparently refers to Section II–B (17) of the 2002 Recovery Plan, titled *"Grievance Procedures,"* which provides:

All grievance procedures in any collective bargaining agreement shall be amended to include a provision that requires the following as part of the initial filing of any grievance:

a. *Specific* identification of nature and all details concerning the grievance in question.

b. *Specific* identification of the section of the collective bargaining agreement which has been violated.

c. *Specific* remedy requested including the section of the collective bargaining agreement which authorizes the remedy requested.

d. The grievance must be filed within a 7–day period following the first occurrence giving rise to the grievance.

ployees record leave time on an absence report copied to the department director.[12]

Section 241 of Act 47 specifies the contents of a recovery plan. The section empowers the Act 47 Plan Coordinator to formulate a recovery plan which shall include any of the enumerated factors as relevant to alleviate financially distressed status, including possible changes in collective bargaining agreements and permanent and temporary staffing level changes or changes in organization. 53 P.S. § 11701.241(3). This enabling language contains no further qualification.

We reject the FOP's argument on this issue. Having reviewed the 2002 Recovery Plan in its entirety, we are satisfied that all its provisions bear some rational relationship to cost containment and improved efficiency. The provisions generally referenced by the FOP relate to discovering and controlling leave abuse and to reducing administrative time and professional costs incurred in determining the nature of vague grievances. In the absence of express statutory limitation, there is no legal basis to distinguish between economic provisions and administrative provisions of the 2002 Recovery Plan.

### B. Judicial Review

#### 1. Scope and Standard of Review

As stated above, the scope of review of an Act 111 arbitration award is in the nature of narrow *certiorari*. However, one of the elements of such review is for excesses in the exercise of the arbitrators' powers, such as requiring an illegal act or an act which a municipality may not do voluntarily. *Washington Arbitration Case; FOP v. Yablonsky*. We discern no

error in the common pleas court's review of the award to determine whether it compelled the City to act in a manner proscribed by Act 47 or whether it required the City to do something it could not do voluntarily.

As to the standard of review, courts afford deference to Act 111 arbitrators' findings of fact, but review of questions of law within the elements of narrow *certiorari* is non-deferential. *Town of McCandless v. McCandless Police Officers Ass'n*, 587 Pa. 525, 901 A.2d 991 (2006) (unless determination depends on arbitral factfinding or construction of CBA, no reason why court should defer to arbitrator on questions of whether there was an excess of the arbitrator's powers).

#### 2. Available Remedies

The parties raise challenging arguments on the question of how to remedy an Act 111 interest arbitration award that is determined to violate an Act 47 recovery plan.

The FOP reminds us the General Assembly intended there to be minimal, if any, judicial interference with the Act 111 arbitration process. Should a court decide that an interest arbitration award runs afoul of an Act 47 recovery plan, the award should be sent back to the arbitration panel with instructions for modification. Otherwise, a reviewing court would become a "super arbitrator." Conversely, the City argues that the arbitration panel lacks authority to modify its decision.

The authority of the common pleas court to vacate an arbitration award under certain conditions is founded in statutory and common law. The Uniform Arbitration

---

The City will have no duty to process or arbitrate any grievance which does not comply with these requirements.

R.R. at 190a (emphasis added).

12. The FOP apparently refers to Section II–B (20), titled *"Absence Report."* The City does not assert that this provision of the Recovery Plan should be added to the FOP award.

Act[13] applies to collective bargaining agreements to arbitrate where the arbitration is consistent with any statute regulating labor and management relations. 42 Pa.C.S. §§ 7302(b), (d); Bar Association Comment (subsection d is intended to preserve without change the scope of review which presently exists over awards of arbitrators such as those appointed under Act 111). The Uniform Arbitration Act expressly permits a court to vacate an arbitration award where the arbitrators exceeded their powers. 42 Pa.C.S. § 7314(a)(1)(iii). Also, the Uniform Arbitration Act allows a court to modify an arbitration award under certain circumstances. 42 Pa.C.S. §§ 7302(d), 7315. These statutory authorizations to common pleas courts are consistent with long-standing direction from our Supreme Court:

> In the instant case the adjudicatory power is an arbitration panel. Since it is a creature of the Legislature we must look to see if its powers were restricted in any way. If they were, and *if the panel went beyond the limits of its authority, then it committed an excess in the exercise of power and the tainted portions of its mandate may be reviewed and corrected.*

*Washington Arbitration Case,* 436 Pa. at 174–75, 259 A.2d at 441 (emphasis added).

Neither legal error nor abuse of discretion is evident in the common pleas court's decision to vacate and modify the award without remand to the arbitrators. As to legal error, the common pleas court's action is authorized by the Uniform Arbitration Act and by Supreme Court precedent. As to the court's decision to modify rather than to remand, no abuse of discretion is present. Given the unconscionable delay during the arbitration process and the parties' unwillingness to streamline the issues for review, the common pleas court had good reason to decline the "start-from-scratch" approach to modification.

In sum, while we respect the need for judicial restraint in a court's limited review of Act 111 arbitration awards, we discern no error in the breadth or manner of the common pleas court's review here.

Similarly, authority for this Court's appellate review of the orders of the common pleas court is also set by statute. "An appellate court may affirm, *modify,* vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances." 42 Pa.C.S. § 706 (emphasis added).

Therefore, we may modify the orders of the common pleas court. As noted above, the court issued its first order vacating award provisions which violated the 2002 Recovery Plan. Unfortunately, the court never specified which award provisions were vacated. Also, the court issued its second order generally modifying the arbitration award to incorporate the terms of the 2002 Recovery Plan. The court, however, never explained how the incorporation of the Recovery Plan into the award was to be accomplished. To the extent necessary to clarify the relations between the parties, we will modify the orders of the common pleas court, as discussed more fully below.

### C. Unlawful Act

The FOP argues that the award does not require an unlawful act necessitating its vacation.

### 1. Amendment of Recovery Plan

■ The FOP asserts the City can voluntarily amend the 2002 Recovery Plan to

13. 42 Pa.C.S. §§ 7301–7320.

bring the award into compliance with the plan. Also, relying on language in Act 111, they argue that an interest arbitration award is a mandate compelling a municipality to take legislative action such as amending the Recovery Plan. 43 P.S. § 217.7(a) (determination by arbitration panel shall constitute mandate to appropriate body to take action necessary to carry out award); *see Washington Arbitration Case* (public employer may not hide behind self-imposed legal restrictions; if award requires affirmative action by legislative body it must take such action if within its power).

The City contends that under Act 47 only the entity that developed the recovery plan has the authority to initiate amendments to it. Because the Act 47 Coordinator developed the 2002 Recovery Plan here, only the Act 47 Coordinator, not the City, may initiate amendments to it.

Further, the terms of the 2002 Recovery Plan make clear that amendments must be "based upon the approval of the [Act 47] Coordinator in conjunction with [DCED]." Chapter II–B Prologue, R.R. at 184a. Additionally, "[a]ny such change must be in conformance with the financial parameters of the Recovery Plan." *Id.*

The City asserts that the FOP's contentions on this issue are untrue and would undermine the central intent of Act 47. It also asserts that because the award here deviates from the 2002 Recovery Plan, directing the City to comply with the award and demanding the City amend the Recovery Plan to conform to the award would be an order to perform an act which the City is prohibited from performing.

For the reasons discussed at length in the decision involving the City's fire fighters, *Scranton v. Fire Fighters,* we reject the FOP's arguments and hold that where, as here, the coordinator's recovery plan was adopted, the coordinator is the one

empowered to initiate any amendment. Conversely, where the coordinator's recovery plan was adopted, the municipality is not empowered to initiate amendment of the plan. Accordingly, we discern no error in the common pleas court's conclusion that the City here could not unilaterally amend the 2002 Recovery Plan to comply with the arbitration award.

## 2. Terms of Award

The FOP contends the award does not violate, expand or diminish the 2002 Recovery Plan, for several reasons.

### a. Expiration of Recovery Plan

The FOP argues that the 2002 Recovery Plan expired by its terms on December 31, 2005. Thus, the Plan does not restrain any award provisions effective after that date.

The City contends the 2002 Recovery Plan did not expire; rather, by its terms it continues in full force and effect. The City highlights Plan language addressing "the period 2002, 2003, 2004, 2005 *and beyond,*" R.R. at 165a (emphasis added), and the Plan's fiscal projections which extend through 2007.

■ Also, the City reminds us that its distressed status continues. Under these circumstances, the terms of the Recovery Plan must remain in effect until either the City's status is changed or the Plan is superseded by another recovery plan. Such a conclusion is compelled by the purpose behind Act 47, for a distressed municipality such as the City to reach fiscal recovery.

As to the specific directives for wages and benefits in some years but not in others, the City argues mandatory provisions of the Recovery Plan should not be avoided by protracted litigation. Rather, the provisions should continue in effect.

The City relies on *Pennsylvania State Park Officers Ass'n v. Pennsylvania Labor Relations Board*, 854 A.2d 674 (Pa. Cmwlth.2004), and similar cases requiring the maintenance of status quo during collective bargaining after the expiration of a CBA.

We reject the contentions of both parties. Instead, we analyze the plain language of each contested provision of the 2002 Recovery Plan to determine its effective dates. The Plan expressly includes "labor relations, cost containment and related provisions" for "the remainder of 2002 as well as the period 2003–2005 and beyond." As discussed more fully below, we conclude that some provisions apply in certain years, while other provisions contain no limit to their duration.

### b. Wages

The arbitration panel majority made the following award of wages:

*Wages.*

Within 45 days of the execution of this Award by at least a majority of the Panel, all bargaining unit members who are on the payroll on the corresponding dates listed below shall receive wage increases of bonuses in accordance with the following:

| | |
|---|---|
| January 1, 2003 | $1000 lump sum bonus. |
| January 1, 2004 | $1250 lump sum bonus. |
| January 1, 2005 | $1500 lump sum bonus. |
| December 31, 2005 | 5.5% increase across the board. |
| January 1, 2006 | 3.5% increase across the board. |
| January 1, 2007 | 4.0% increase across the board. |

R.R. at 25a.

By comparison, Sections II–B (2), (3) of the 2002 Recovery Plan provide:

2. *Wages. For 2003, 2004, and 2005, the base hourly wages and salaries of all City employees shall not exceed existing (2002) rates,* except to the extent that future collective bargaining agreements, arbitration awards, or other means result in using the moneys made available in Item 3 below for wage in-

creases. (As of the adoption of this plan, the City's DPW employees are negotiating with the City for the year 2002. Should the bargaining unit and the City come to an agreement on wages for 2002, such rates shall be considered the 2002 rate for these employees.)

3. *Personnel Costs. For 2003 a total of $225,000* will be available to meet any adjustments in personnel-related costs for all City employees, including those costs resulting from collective bargaining, arbitration, and/or other means; *for 2004 a total of $400,000* will be available to meet the costs of any such adjustments; and *for 2005 a total of $605,435 will be available.* Distribution of these moneys among the various departments/bargaining units shall be fair and equitable and shall generally be in proportion to the actual 2001 costs incurred for each department/bargaining unit. Uses of these moneys could include one-time bonuses, wage adjustments, offsets against medical co-pays, etc. as determined by collective bargaining, arbitration, or other means. *Whatever the terms of future collective bargaining agreements, arbitration awards, etc., no back wages or other retroactive adjustments shall be paid.*

R.R. at 185a (emphasis added).

The FOP argues the wage provisions of the award compare favorably to the Recovery Plan provisions, which did not require a wage "freeze." It acknowledges the following Recovery Plan provision relating to retroactive wages: "Whatever the terms of future collective bargaining agreements, arbitration awards, etc., no back wages or other retroactive adjustments shall be paid." Section II–B (3), R.R. at 191a. The FOP contends, however, that the lump sum bonuses awarded for 2003, 2004, and 2005 could be awarded in the April 7, 2006 award because they are not back wages or

wage adjustments; rather, they are payments in lieu of wages. Similarly, they contend that despite the prohibition against retroactive adjustments, the December 31, 2005 wage increase could be awarded in the April 7, 2006 award because it was effective for only one day of the Recovery Plan's existence and was therefore *de minimis.*

The City contends the award of annual bonuses for 2003, 2004 and 2005 salary increases for 2005, 2006 and 2007 violates the Recovery Plan by exceeding the wages and salaries permitted under Section II–B (2) of the Plan, titled *"Wages."* The City further contends the award of bonuses and salaries exceeds the budgeted adjustments for personnel costs and violates the prohibition against retroactive adjustments set forth in Section II–B (3) of the Recovery Plan, titled *"Personnel Costs."*

For reasons fully explained in our recent decision in the parallel case of *Scranton v. Fire Fighters,* we conclude that the April 7, 2006 award violates Section II–B (3) of the 2002 Recovery plan because it awards back wages or retroactive adjustments for 2003, 2004, 2005 and part of 2006.

We reject the City's contention that the specific year wage limitations and total adjustment limits remain in effect indefinitely. The plain language of the provisions does not support the argument. Rather, the plain language of the 2002 Recovery Plan indicates that the wage limitations and total personnel cost adjustments apply in years 2003, 2004 and 2005 only. Because an award of wage increases of 3.5% in 2006 and 4.0% in 2007 does not conflict with a clear, specific provision of the 2002 Recovery Plan, the wage increases may be awarded prospectively. *City of Farrell* (Act 47 prohibits clear, specific recommendations of recovery plan from being violated, expended or diminished).

As a result of our conclusions, the court orders are modified to expressly vacate bonuses for 2003, 2004, and 2005, to vacate the 5.5% wage increase effective December 31, 2005, and to make the 3.5% wage increase effective the date of the award, April 7, 2006. The wage increase of 4.0% effective January 1, 2007 is confirmed.

### c. Health Care

The panel majority made the following award for health care:

*Health Insurance*

A. The City is ordered to fully cooperate with the Health Care Committee by providing all information reasonably necessary to its function and by cooperating with the National Health Care Consultant in the Committee's efforts to contain health care costs.

B. Effective 30 days after the issuance of this award, *the applicable deductibles and/or copayments shall be adjusted as follows:*

1. The maximum individual annual deductible under the medical insurance plan shall be increased from $200 to $400 for in-network and out-of-network.

2. The maximum family annual deductible shall be increased from $400 to $800 for in net work and out-of-network.

3. The per-visit emergency room co-pay shall be increased from $35 to $75.

4. The per-visit doctor co pay shall be increased from $5 to $10.

5. The co-payment for the prescription plan shall be increased to $6 for generics and $15 for brand name drugs.

C. Article XXIII, Sections 3(A) and (B) of the collective bargaining

agreement shall be amended as follows:

1. Effective January 1, 2003, the City shall be liable for the cost of health insurance (over and above the listed deductibles and co-payments) up to the annual amounts listed below:

| | |
|---|---|
| Single Coverage | $3,692 |
| Parent/Child | $7,298 |
| Parent/Children | $7,869 |
| Husband/Wife | $9,261 |
| Family | $9,933 |

2. *As of January 1, 2004, the City shall be responsible for 50% of any increases in the cost of health care for active bargaining unit employees beyond that provided above and the active employees shall be responsible for the balance of any subsequent increases as determined by the healthcare provider.*

D. Article XXIII, Section 9 Retiree Health Insurance shall be amended as follows: *Effective January 1, 2007, all officers otherwise eligible to receive retiree health insurance under the 1996–2002 Agreement shall continue to be eligible to receive insurance for a period of 5 years following the officer's retirement.*

R.R. at 25a–27a (emphasis added).

By comparison, Section II–B (5) of the 2002 Recovery Plan provides:

*Health Insurance Benefits. Beginning January 1, 2003, the maximum annual dollar amount which the City will pay to meet all health care costs of any nature shall be $7,191,812* (equal to the City's actual 2001 cost). This amount shall meet all costs relating, but not limited to, medical and major medical, dental, vision, and prescription coverages; administrative costs; and cash payments to individuals that opt not to receive City health benefits and apply to all eligible current employees and their eligible dependents and eligible former employees and their eligible dependents. The allocation of this amount to cover eligible recipients shall be fair and equitable and shall generally be in proportion to the actual 2001 costs incurred for each department/bargaining unit.

The specific health benefits and coverage for eligible employees, retirees, and dependents shall be determined by the Healthcare Committee.

*Effective January 1, 2003, the City will cease to extend health care benefits to employees who retire on or after that date.*

R.R. at 186a–87a (emphasis added).

The FOP points out that the Recovery Plan does not prohibit increases in the City's obligations; rather, the Plan places a cap on the total amount for certain years. Thus, the fact that there was an increase in the City's obligations is not dispositive in determining whether the award violates the Recovery Plan. The FOP declares that the record lacks evidence that the award caused the City to expend money in excess of the cap in any year.[14]

---

**14.** The FOP acknowledges the following provision in the 2002 Recovery Plan related to health care costs: "The allocation of [the maximum annual dollar amount to meet health care costs] shall be fair and equitable and shall generally be in proportion to the actual 2001 costs incurred for each department/bargaining unit." Section II–B (5), R.R. at 186a–87a. They assert, however, no evidence demonstrates that the admitted increase in the health care obligation to the FOP was not fair and equitable. They further contend that the proportionality language is in the nature of non-binding recommendation rather than a mandatory directive, and they rely on *City of Farrell.*

The City asserts the Health Insurance provision of the award violates the 2002 Recovery Plan in several ways. It exceeds the budgeted adjustments for health care related costs under Section II–B (5) of the Plan. Also, the award allows police officers to retire with lifetime health care benefits, contrary to the provision in the same section of the Recovery Plan, which proclaims such benefits will cease for employees retiring after January 1, 2003, the effective date of the Plan.

We conclude the award violates Section II–B (5) of the 2002 Recovery Plan because it allows police officers to retire after January 1, 2007 with health care benefits for five years. This will be discussed more fully below.

We reject the FOP's argument that the cessation of health care benefits for those retiring after January 1, 2003 lapsed. There is nothing in the plain language of the provision which places limitations on the duration of the Recovery Plan's "Health Insurance Benefits" provisions.

We reject the City's assertion that the health care provisions of the award violate the annual maximum health care costs clause. This broad assertion is not supported by the record or clarified by argument. Indeed, the City fails to quantify

the claimed excess or to explain how it might be ascertained.

As a result of our conclusion, the common pleas court orders are modified to vacate paragraph 3(D) and to substitute the following language reflective of Section II–B (5) of the 2002 Recovery Plan: "Effective February 6, 2009, the City will cease to extend health care benefits to employees who retire on or after that date." [15]

#### d. Police Department Administration

#### i. Provisions of Award, Recovery Plan

As part of its award, the arbitration panel majority amended the "Memorandum of Agreement by and between the Duly Authorized Representatives of the Strategic Implementation Team of the City of Scranton and the . . . FOP Regarding the Structure and Compensation of the City of Scranton Police Department ('The SIT Agreement')." R.R. at 27a–30a; *see* R.R. at 1786a–99a (amended SIT Agreement dated May 19, 1999). In particular, the panel majority allowed the City to institute 10 hour shifts, made modifications to the manning schedules, and addressed assignment of detectives, drug and alcohol testing and other assignments and staffing.[16]

The City does not assert that the award violated the proportionality language; therefore, we need not address this issue.

15. The prospective nature of this modification results from the concern for retroactive changes in retirement benefits for the FOP who retired during the prolonged litigation, as discussed more fully below.

16. The actual terms of the award are as follows, with emphasis added:

*Police Department Administration*
The Collective Bargaining Agreement including the incorporated Memorandum of Agreement by and between the Duly Authorized Representatives of the Strategic

Implementation Team of the City of Scranton and the E.B. Jermyn Lodge No. 2 FOP Regarding the Structure and Compensation of the City of Scranton Police Department ("The SIT Agreement") shall be amended as follows:
A. *The City may institute ten hour shifts with overlap during the A.M. and P.M. rush hours to reflect the volume of calls for service or incidents.* The shifts shall be filled by seniority in accordance with the existing terms and conditions of the agreement. Officers on ten hour shifts shall work four ten hour days per week at straight time with overtime payable only after then hours. The parties shall meet and reach agreement on the necessary revisions in the vacation

By comparison, Section II–B (1) of the 2002 Recovery Plan provides:

> *Management Rights. The City shall have the right to determine the organizational structure of each Department including, but not limited to, the right to determine and change job duties for each position, the right to determine and change schedules for each employee, and the right to assign work to any employee.* Any provision in any collective bargaining agreement which is inconsistent with, or which interferes with, the rights of the City as set forth above, shall be eliminated to the extent of such inconsistency or interference, and the City's management rights, as set forth above, shall not be the subject of any grievance procedure or arbitration clause in any collective bargaining agreement between the City and any of its unions.

R.R. at 184a–85a (emphasis added). However, Section II–B (1) of the Provisions Specifically for the Police Department of the 2002 Recovery Plan, titled "Organizational Structure and Scheduling," contains more specific statements as to how the police department will be reorganized and how the SIT Agreement will be modified.[17]

schedule and utilization of days off to accommodate the ten hour shift schedule.

B. *Shift Manning: The City shall set a shift manning schedule which will include all uniformed officers. The minimum manning requirements currently existing shall be modified as follows:*

1. The City may eliminate the 26/27 officer per platoon requirement.

2. Highway Officers shall be included in the count for the determination of shift manning.

3. The City shall reserve the right to eliminate the position(s) of Highway Lieutenant, Training Lieutenant and Central Records (Administrative Lieutenant) through attrition. The Training Lieutenant position shall be replaced with the current Training Sergeant. The Training Unit shall be placed under the Administrative Division Lieutenant. Supervisory positions in the Juvenile Division shall be eliminated.

4. The position of Corporal shall be eliminated by attrition.

5. One Detective Sergeant position will be eliminated by attrition.

6. If the "COPS in School" program is maintained at the current level, one juvenile officer position will be eliminated.

7. Up to 10% of the bargaining unit may be assigned to special duty assignments.

C. *Assignment of Detectives:* The City shall have the option to reinstate the midnight shift for one or more detectives if it deems it appropriate to provide needed service to the public. If the City chooses this option, it shall negotiate an appropriate rate of compensation for this position.

D. *Drug and Alcohol Testing:* In the 1996–2002 Agreement the parties had an incorporated Drug and Alcohol Testing program. The parties shall negotiate modifications to that program or, if they so choose, it may adopt the Drug and Alcohol Policy previously incorporated in the collective bargaining agreement covering employees in the Department of Public Works.

E. Other Assignments and Staffing: *Subject to the express provisions of the Collective Bargaining Agreement* (specifically Article I Section 2 of the 1996–2002 Collective Bargaining Agreement), *including the obligations set forth in the incorporated SIT Agreement as amended, the City shall have the right to determine the organizational structure and operation of the Department including the right to determine and change job duties for each position and the right to assign work to any employee. In the exercise of this right, the City shall not unreasonably or arbitrarily endanger the safety or health of bargaining unit members.*

17. Section II–B (1) of the Provisions Specifically for the Police Department of the 2002 Recovery Plan, titled *"Organizational Structure and Scheduling,"* provides in its entirety, with emphasis added, at R.R. 194a–96a:

1. *Organizational Structure and Scheduling.* Scranton Police Department shall be modified organizationally, structurally, and functionally to ensure necessary cost containment, while ensuring the best possible service to the citizens of Scranton. *The police department's existing shifts/platoons and the current organizational plan developed by the SIT Committee shall be modified*

Also for comparison, Section II–B (7) of the 2002 Recovery Plan, titled *"Elimina-* *tion of Minimum Manning,"* provides that minimum manning requirements

*to better reflect the temporal, demographic, and geographical conditions of the City.*

Although the present collective bargaining agreement states that the Scranton Police Department shall consist of three "Divisions," the department is in fact comprised of four Divisions: Patrol, Detective, Administrative Support, and Training and Special Services.

*Detective Division.* The current distribution of manpower and supervisory oversight in the Detective Division shall be evaluated to minimize overtime and unnecessary call time. The City shall have the right to determine schedules based on such evaluation. The Director of Public Safety and the Chief of Police shall provide a new detective schedule no later than July 1, 2002 to be effective January 1, 2003. The resulting schedule may be altered at any time with 14 days notice or in case of emergency. A rotational "on call" plan shall be implemented to minimize the current use of overtime time/compensatory time off. No compensatory time off shall be paid to detectives for carrying a pager outside of duty hours.

*Administrative Division.* The Administrative Division consists of one sworn officer (a lieutenant) and a number of clerical positions located throughout the various organizational segments of the police department. These clerical positions shall be placed under the direct control of the organizational division where assigned. The Department's Grant Writer shall fall under the immediate direction, control, and supervision of the Chief of Police. The functional component of the Administrative Division shall be reevaluated to determine if additional administrative/staff related duties should be included.

*Training and Special Services Division.* The Training and Special Services Division presently consists of two sworn officers—a Captain and a Sergeant. The Training and Special Services Division shall be eliminated and incorporated as a "Section" under the direct supervision of the Administrative Division Lieutenant. This Section shall consist of a Training Unit and a Special Services Unit. This change will result in the elimination of the position of "Training Captain" and ensure a more appropriately structured department. Each unit shall

consist of one police officer with a rank of not to exceed sergeant. Such action will occur upon the retirement of present Administrative Captain.

*Patrol Division.* The present structure of the Patrol Division consists of three equally manned patrol shifts or platoons. This current method does not achieve a proper balance of manpower according to "shift activity." The current structure shall be changed to reflect the volume of police activity. An assignment schedule shall be designed to place officers on duty according to the amount of police activity and to reflect the functional, spatial, and temporal workload demands.

The present "Highway Unit" located within the Patrol Division shall be eliminated. Accident investigation and related duties shall be incorporated into the regular patrol function of the Division.

According to the International Association of Chiefs of Police, police activity in the average community generally occurs as follows:

22% night shift (12:00 a.m.–8:00 a.m.)
33% day shift (8:00 a.m.–4:00 p.m.)
45% evening shift (4:00 p.m.–12:00 a.m.)

Currently, manpower distribution in the Scranton Police Department does not reflect the workload. Therefore, the three basic shifts shall be reorganized to better reflect police activity, as well as to improve response time and officer safety. *In order to achieve a better balance, a fourth shift or "D" shift may be implemented.* In addition, a limited "back drop" method may be employed to ensure adequate coverage at shift change. (The "back drop" method means that one or two patrol officers begin their respective shifts one hour before or after the remainder of their assigned platoon in order to ensure coverage at shift change.) This will also improve response time and result in minimal "shift change" overtime. *Accordingly, the City shall have the sole right to determine both shift schedules and manpower per shift.* No later than July 1, 2002, the Chief of Police and the Director of Public Safety shall determine the schedules and manpower requirements to be effective January 1, 2003. *Such schedules may be altered at any time with 14 days notice or in case of emergency.*

"shall be eliminated," and "[t]he City shall have the sole right to determine the number of personnel employed and utilized by the City." R.R. at 188a.

### ii. Contentions

The FOP contends that the award provisions substantially mirror the Recovery Plan provisions, especially as to organizational changes that achieve cost containment. Further, the FOP argues that the Recovery Plan envisions modifications to the SIT Agreement, not the abandonment of the SIT Agreement. The FOP then passionately assails the City's perceived position, that Act 47 essentially eliminates collective bargaining, and that a distressed city can forego any semblance of bargaining and unilaterally dictate the terms and conditions of employment.

The City's argument as to how the award violates the 2002 Recovery Plan is contained in Appendix B to its Brief, and at times the argument is hard to follow. The City apparently argues that the "Police Department Administration" provision of the award violates the 2002 Recovery Plan in two affirmative ways. First, the award leaves intact portions of the SIT Agreement which constrain management rights in violation of the Recovery Plan provision set forth above. Second, the award mandates that the City follow minimum manning provisions in violation of the "*Elimination of Minimum Manning*" term of the Recovery Plan. The City also enumerates various ways that the award fails to adopt mandatory provisions of the Recovery Plan. These will be discussed later.

### iii. SIT Agreement, Management Rights

After careful review of the parties' arguments, of the award, and of the Recovery Plan provisions at issue, we reject portions of the City's positions on the SIT Agreement.

The 2002 Recovery Plan envisions that the SIT Agreement remain in effect, although it is to be modified in various ways. The modifications are set forth in Section II–B (1) of the Provisions Specifically for the Police Department of the Recovery Plan, including a recognition that the police department actually consists of four "Divisions," not three, a realignment of the Training and Special Services Division, elimination of the "Highway Unit," and institution of a fourth shift and a limited "back drop" method to ensure adequate coverage at shift changes. R.R. at 194a–96a.

We expressly reject the City's statement that unidentified portions of the surviving SIT Agreement restrain its management rights, for two reasons. First, we reject the notion that the SIT Agreement is totally abrogated, since the 2002 Recovery Plan does not specifically provide for anything other than a modification of the SIT Agreement. In this regard, it is important to note that the SIT Agreement and its predecessor Agreement were products of collaboration between the City, the FOP and the Act 47 Coordinator. R.R. at 1786a. We believe it unreasonable to assume that the Act 47 Coordinator would draft the 2002 Recovery Plan in such a way as to implicitly and totally unravel its earlier accomplishment.

Second, the City's statement is not sufficiently developed for us to understand how the continuing, if modified, terms of the SIT Agreement constrain it. Except as discussed below with regard to minimum manning, the City fails to disclose which provisions of the SIT Agreement are at issue and which management rights are constrained.

Considering the foregoing, we decline to eliminate all references to the SIT Agree-

ment, although we will modify the common pleas court orders to expressly include the language of Section II–B (1) of the Provisions Specifically for the Police Department of the 2002 Recovery Plan. This inclusion will clarify the relationship between the parties by specifying the modifications to the SIT Agreement.

### iv. Minimum Manning

With regard to minimum manning, however, we reach a different conclusion. Paragraph 4(B) of the award, titled *"Shift Manning,"* specifically provides for a modification of the "minimum manning requirements currently existing." R.R. at 28a–29a. The existing minimum manning requirements are presumably those set forth in Article IX of the SIT Agreement, titled **"Patrol Work Shift."** R.R. at 1793a–96a.

We conclude that Paragraph 4(B) of the award violates Section II–B (7) of the 2002 Recovery Plan, titled *"Elimination of Minimum Manning,"* to the extent it retains the minimum manning provisions of Article IX of the SIT Agreement. The Recovery Plan provision eliminating minimum manning has no obvious limitation on duration. Accordingly, the common pleas court orders shall be modified to expressly vacate Paragraph 4(B) of the award.

We reject the FOP's arguments that these modifications essentially eliminate collective bargaining. There is no doubt that the Recovery Plan provisions impact the terms over which the FOP can bargain; however, the Plan's recommendations are considered mandatory. *FOP v. Yablonsky* (legislature gave bargaining units the power to continue to be protected by the provisions of Act 111, but only to the extent the bargaining does not interfere with terms of recovery plan; bargaining rights bestowed by legislature may be limited or revoked by it); *see Wilkinsburg,*

535 Pa. at 435, 636 A.2d at 139 (even if section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards it would not violate the Pennsylvania Constitution). Moreover, Section 241 of Act 47 specifically authorizes recovery plan provisions involving "permanent and temporary staffing level changes or changes in organization." 53 P.S. § 11701.241(3).

### e. Other Provisions of Plan Not Adopted

■ The FOP argues in support of the panel majority's broad refusal to adopt other provisions of the 2002 Recovery Plan into the award. They assert the City's position essentially eliminates collective bargaining and allows a distressed municipality to unilaterally dictate the terms and conditions of employment.

The City complains that the award violates the 2002 Recovery Plan by failing to incorporate the following provisions of the Plan applicable to all employees:

- Section II–B (1), titled *"Management Rights;"*
- Section II–B (6), titled *"Regular Part-time Employees;"*
- Section II–B (8), titled *"Clothing Allowance;"*
- Section II–B (9), titled *"Longevity;"*
- Section II–B (10), titled *"Elimination of Subcontracting Clauses;"*
- Section II–B (11), titled *"Duplication of Benefits;"*
- Section II–B (13), titled *"Family Medical Leave Act;"*
- Section II–B (14), titled *"Short-term Disability Insurance;"*
- Section II–B (15), titled *"Workers' Compensation;"*
- Section II–B (16), titled *"Elimination of Past Practices;"*

· Section II–B (17), titled *"Grievance Procedures;"*

· Section II–B (18), titled *"Drug and Alcohol Testing;"* and

· Section II–B (21), titled *"Job Descriptions."*

In addition, the City asserts that the award violates the 2002 Recovery Plan by failing to incorporate the following provisions of the Plan Specifically for the Police Department:

· Section II–B (2), titled *"Supervisory Assignments;"*

· Section II–B (3), titled *"Court Time;"*

· Section II–B (4), titled *"Compensatory Time;"*

· Section II–B (5), titled *"Management Positions;"*

· Section II–B (6), titled *"Traffic Maintenance Bureau and Public Safety Mechanics;"*

· Section II–B (7), titled *"Leave Policy;"* and,

· Section II–B (8), titled *"Heart and Lung–Police Officers."* [18]

With two exceptions discussed below, we agree with the City. We conclude that the award violates the 2002 Recovery Plan by failing to include Sections II–B (6), (8) through (11) inclusive, (13) through (17) inclusive, and (21) of the provisions of the Plan applicable to all employees. Further, we conclude that the award violates the 2002 Recovery Plan by failing to include Sections II–B (2) through (7) inclusive, and (9) of the Plan Provisions Specifically for the Police Department. The Recovery Plan states "to the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that the implementation of these cost containment provisions is mandatory." R.R. at 184a. Therefore, the common pleas court orders are modified to expressly include those provisions in the award.

We find no merit in the City's position on two Recovery Plan provisions: Sections II–B (1) and (18), titled *"Management Rights,"* and *"Drug and Alcohol Testing,"* respectively. Contrary to the City's arguments, both of these provisions were addressed in the award. The City fails to explain why the award provisions are inadequate, other than what has been previously discussed regarding the SIT Agreement.

We reject the FOP's arguments that inclusion of provisions at issue here essentially eliminates collective bargaining. There is no doubt that the Recovery Plan provisions have an impact on the terms over which the FOP can bargain; however, the arbitration process is an adequate remedy. *FOP v. Yablonsky* (police union will not have ability to negotiate in the manner it would had no recovery plan been adopted, but arbitration process provides adequate remedy, based upon legislative intent in Act 47 to limit effect of bargaining on recovery plan provisions; rights the legislature bestows it may limit or revoke); *see Wilkinsburg*, 535 Pa. at 435, 636 A.2d at 139 (even if section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards it would not violate the Pennsylvania Constitution). Moreover, Section 241 of Act 47 specifically authorizes recovery plan provisions involving "[p]ossible changes in collective bargaining agreements...." 53 P.S. § 11701.241(3).

---

**18.** Without explanation, the City also asserts the award failed to incorporate Section II–B (21) of the Provisions Specifically for the Public Works Department, titled, *"S.I.T. Clerks."* In the absence of an explanation of why a public works provision should be incorporated into the FOP award, we reject this assertion.

### 3. Waiver by Failure to Raise Arguments

In their Reply Brief, the FOP asserts that the City left the arbitration panel in the dark regarding its position on many of the issues in the case, resulting in waiver of those arguments. Other than the charts appended to the City's Brief, the FOP does not identify which arguments were not raised to the arbitration panel.

As this argument was raised in the Reply Brief, and no responsive brief from the City was permitted, there is no argument from the City on this point.

For reasons fully explained in our opinion in the case involving the City's fire fighters, *Scranton v. Fire Fighters,* we reject the FOP's position on waiver.

### D. Illegality of Recovery Plan

The FOP asserts the 2002 Recovery Plan is illegal and therefore unenforceable, based on several theories.

### 1. State Adverse Interest Act

Section 3 of the State Adverse Interest Act [19] provides: "No State advisor or State consultant having recommended to the State agency which he serves, either the making of a contract or a course of action of which the making of a contract is an express or implied part, shall, at any time thereafter, have an adverse interest in such contract." The FOP contends that the Act 47 Coordinator violated this provision because since 2002 it has continued to collect significant fees as a direct result of its recommendation to DECD that the City remain in distressed status. Without reference to any authority to support this remedy, the FOP asserts the 2002 Recovery Plan is tainted beyond reclamation, rendering the Plan void *ab initio.*

Anticipating the City's arguments, the FOP seeks to distinguish this Court's decision in *FOP v. Yablonsky,* which rejected the argument that a distressed municipality's recovery plan is invalid because Act 47 coordinator violated State Adverse Interest Act. The FOP highlights different facts: Act 47 Coordinator here recommended continuation of distressed status over a prolonged period, while in *FOP v. Yablonsky* the Act 47 coordinator did not participate in a determination of distressed status.

The City raises several points in defense on this issue. First, the City contends the issue is beyond the matters to be reviewed under narrow *certiorari.* Second, the City argues the FOP is not aggrieved by the relationship between DCED and the Act 47 Coordinator; accordingly, they lack standing to bring the claim. Third, the City challenges whether the FOP stated a claim under the State Adverse Interest Act, citing *FOP v. Yablonsky* and *Fire Fighters v. Yablonsky.* Fourth, the City points out that the State Adverse Interest Act imposes criminal penalties and has no provision for the declaratory relief the FOP seeks here.

We conclude that *FOP v. Yablonsky* controls this issue and commands rejection of the FOPs' challenge based on the State Adverse Interest Act. The factual distinctions raised by the FOP are immaterial. Further, there is no provision in the State Adverse Interest Act which permits the remedy the FOP seeks.

As a broader concern, we question whether review of an interest arbitration award is the appropriate manner for resolving the purported illegality of an Act 47 recovery plan. This is because many affected parties, such as other unions and

---

19. 71 P.S. § 776.3.

municipal bond holders, have no opportunity to participate.

## 2. Recovery Plan Conflict with Act 111

In an argument primarily raised in rebuttal,[20] the FOP asserts that the 2002 Recovery Plan is illegal because the *"Management Rights"* provision, removes mandatory subjects of bargaining guaranteed by Section 1 of Act 111, 43 P.S. § 217.1, read in *pari materia* with the Pennsylvania Labor Relations Act.[21] It cites various cases which do not involve a distressed municipality under Act 47.[22] Also, illegality of the Recovery Plan is premised on the *"Health Insurance Benefits"* provision, which the FOP alleges improperly effects a change in health care costs for existing retirees. They rely on another case which does not involve a distressed municipality under Act 47.[23] Additionally, they reference the *"Regular Part-time Employees"* provision of the 2002 Recovery Plan,[24] arguing that by conferring sole discretion in the City, it eradicates bargaining over starting wages and duties of such employees.

The FOP stresses that these provisions of the 2002 Recovery Plan go beyond the limitations on bargaining tolerated under Wilkinsburg. Instead, the referenced provisions eliminate bargaining altogether.

**20.** The argument was first mentioned in note 16, page 51 of the FOP's Brief, consisting of three sentences.

**21.** Act of June 1, 1937, P.L. 1168, 43 P.S. §§ 211.1–211.13.

**22.** *Indiana Borough v. Pa. Labor Relations Bd.,* 695 A.2d 470 (Pa.Cmwlth.1997); *City of Bethlehem v. Pa. Labor Relations Bd.,* 153 Pa.Cmwlth. 544, 621 A.2d 1184 (1993); *Twp. of U. Saucon v. Pa. Labor Relations Bd.,* 152 Pa.Cmwlth. 530, 620 A.2d 71 (1993). None of the cases deals with a distressed municipality or the impact of Act 47; accordingly, the cases are inapposite.

**23.** *Twp. of Wilkins v. Wage & Policy Comm. of the Wilkins Twp. Police Dep't,* 696 A.2d 917 (Pa.Cmwlth.1997) (municipality may not enter into agreement over rights of existing retirees because such individuals are no longer members of bargaining unit; arbitrators without jurisdiction to consider issue).

**24.** Section II–B (6) of the 2002 Recovery Plan, R.R. at 187a, provides:

*Regular Part-time Employees.* The City shall have the right to hire regular part-time employees. Regular part-time employees shall be used or scheduled in such a fashion so as to virtually eliminate the need for nonemergency overtime within the City. Regular part-time employees shall be part of the applicable bargaining unit, and regular part-time police and firefighters will be hired through Civil Service procedures. Regular part-time employees may be scheduled at any time but shall not be scheduled to work more than 35 hours per week (42 hours per week for firefighters), except for court time, training, and in cases of emergency. Regular part-time employees may be used to replace a full-time employee who is absent from work for any reason. In this regard, the City shall have the right to change the schedules of regular part-time employees, for any reason, or to use regular part-time employees as "on call" replacements for full-time employees.

The City shall have the right, in its sole discretion, to determine the starting wages and job duties of regular part-time employees. Thereafter, regular part-time employees shall receive the same percentage increase to their hourly wage, if any, as full-time employees within the same bargaining unit. The City shall not hire regular part-time employees which would displace any existing full-time employees. Qualified part-time employees shall be considered for full-time positions which the City decides to fill through the job posting procedure. In cases of layoffs, all regular part-time employees within a job classification shall be laid off first, according to their reserve seniority, before full-time employees are laid off within the same job classification.

Regular part-time employees shall not be eligible for any form of employee benefits or paid leave.

As this issue was primarily addressed in the FOP's reply brief, no response was made by the City.

For the most part, we reject the FOP's arguments on this issue, for reasons discussed in our decision involving the City's fire fighters, *Scranton v. Fire Fighters.*

There is merit in part of the FOP's arguments, however. We question the legality of retroactive changes in health benefits for those police personnel who retired during this prolonged litigation. Therefore, the cessation of health care benefits shall not be retroactive; rather, the cessation of health care benefits shall apply to those retiring after the effective date of this Court's Order expressly modifying the common pleas court orders to incorporate the 2002 Recovery Plan provision into the award. This is consistent with the prospective language of the Recovery Plan provision on the subject.

### E. Preclusion by Conduct

The FOP highlights conduct by the City which impacts enforceability of the 2002 Recovery Plan and the City's right to challenge the award.

The FOP asserts the City acted in a manner inconsistent with the 2002 Recovery Plan. It argues that the City used an otherwise-ignored Recovery Plan as a shield to avoid its statutory collective bargaining obligations and as a sword to achieve that which it could not obtain at the bargaining table. Without citation to authority, the FOP contends that by this conduct the City is precluded from asserting the Recovery Plan.[25]

The City responds that judicial review is limited to whether the award violates the mandatory provisions of the 2002 Recovery Plan. The narrow *certiorari* review cannot be expanded to include issues unrelated to the particular CBA in question. The City cites *Washington Arbitration Case* and *City of Farrell* for the position that there is limited jurisdiction in the nature of narrow *certiorari* to review propriety of arbitrators' exercise of their powers.

An argument similar to the one advanced by the FOP here was raised by the fire fighters in *Borough of Greenville.* It was rejected by the trial court and, on appeal, by this Court. *See Borough of Greenville,* 952 A.2d at 702 (adopting lower court analysis); *id.* at 705 (Leavitt, J., concurring and dissenting; separately addressing fire fighters' preclusion argument). Rejection of the preclusion argument here is consistent with this recent decision. It is also consistent with the limited scope of judicial review, which here is focused on the propriety of the arbitrators' exercise of their powers.

### V. Conclusion

For all the reasons discussed, we affirm as modified, consistent with the foregoing opinion.

### *ORDER*

**AND NOW,** this 6th day of February, 2009, the orders of the Court of Common Pleas of Lackawanna County, entered October 23, 2007 and January 15, 2008, are **AFFIRMED as MODIFIED.** In particular, the arbitration award effective April 7,

---

**25.** In addition, the FOP briefly argues that because the City bargained over provisions of the award now being challenged, it waived the right to complain about those award provisions. The FOP concedes there is no record on this issue. Appellant's Br. at 32, n. 7.

We reject this argument. We are unaware of any authority holding that by bargaining with a union a public employer relinquishes its ability to challenge an arbitrator's actions. The FOP fails to bring any such authority to our attention.

2006, is modified as follows (with deletions stricken and additions underlined):

1. Term

The modified contract shall be for a term of five years, starting on January 1, 2003 and continuing through December 31, 2007. If, while this modified contract controls the relationship between the parties, the 2002 Recovery Plan is amended to allow some or all of the provisions of the original award, those provisions shall be reinstated as of the effective date of the amendment.

2. Wages

Within 30 days of the issuance of this Award, the wages of all bargaining unit members who are on the payroll on the corresponding dates listed below shall be as follows:

- ~~January 1, 2003~~ ~~$1000 lump sum bonus.~~
- ~~January 1, 2004~~ ~~$1250 lump sum bonus.~~
- ~~January 1, 2005~~ ~~$1500 lump sum bonus.~~
- ~~December 31, 2005~~ ~~5.5% increase across the board.~~
- ~~January 1, 2006~~ April 7, 2006 3.5% increase across the board.
- January 1, 2007 4.0% increase across the board.

3. Health Insurance

A. The City is ordered to fully cooperate with the Health Care Committee by providing all information reasonably necessary to its function and by cooperating with the National Health Care Consultant in the Committee's efforts to contain health care costs.

B. Effective 30 days after the issuance of this award, the applicable deductibles and/or copayments shall be adjusted as follows:

1. The maximum individual annual deductible under the medical insurance plan shall be increased from $200 to $400 for in-network and out-of-network.

2. The maximum family annual deductible shall be increased from $400 to $800 for in net work and out-of-network.

3. The per-visit emergency room co-pay shall be increased from $35 to $75.

4. The per-visit doctor co pay shall be increased from $5 to $10.

5. The co-payment for the prescription plan shall be increased to $6 for generics and $15 for brand name drugs.

C. Article XXIII, Sections 3(A) and (B) of the collective bargaining agreement shall be amended as follows:

1. Effective January 1, 2003, the City shall be liable for the cost of health insurance (over and above the listed deductibles and co-payments) up to the annual amounts listed below:

| | |
|---|---|
| Single Coverage | $3,692 |
| Parent/Child | $7,298 |
| Parent/Children | $7,869 |
| Husband/Wife | $9,261 |
| Family · | $9,933 |

2. As of January 1, 2004, the City shall be responsible for 50% of any increases in the cost of health care for active bargaining unit employees beyond that provided above and the active employees shall be responsible for the balance of any subsequent increases as determined by the healthcare provider.

D. Article XXIII, Section 9 Retiree Health Insurance shall be amended as follows: ~~Effective January 1, 2007, all officers otherwise eligible to receive retiree health insurance under the 1996-2002 Agreement shall continue to be eligible to receive insurance for a period of 5 years following the officer's retirement.~~ Effective February 6, 2009, the City will cease to extend health

care benefits to employees who retire on or after that date.

4. Police Department Administration

The Collective Bargaining Agreement including the incorporated Memorandum of Agreement by and between the Duly Authorized Representatives of the Strategic Implementation Team of the City of Scranton and the E.B. Jermyn Lodge No. 2 FOP Regarding the Structure and Compensation of the City of Scranton Police Department ("The SIT Agreement") shall be amended as follows:

A. The City may institute ten hour shifts with overlap during the A.M. and P.M. rush hours to reflect the volume of calls for service or incidents. The shifts shall be filled by seniority in accordance with the existing terms and conditions of the agreement. Officers on ten hour shifts shall work four ten hour days per week at straight time with overtime payable only after then hours. The parties shall meet and reach agreement on the necessary revisions in the vacation schedule and utilization of days off to accommodate the ten hour shift schedule.

B. *Shift Manning:* The City shall set a shift manning schedule which will include all uniformed officers. The minimum manning requirements currently existing shall be modified as follows:

1. The City may eliminate the 26/27 officer per platoon requirement.

2. Highway Officers shall be included in the count for the determination of shift manning.

3. The City shall reserve the right to eliminate the position(s) of Highway Lieutenant, Training Lieutenant and Central Records (Administrative Lieutenant) through attrition. The Training Lieutenant position shall be replaced with the current Training Sergeant. The Training Unit shall be placed under the Administrative Division Lieutenant. Supervisory positions in the Juvenile Division shall be eliminated.

4. The position of Corporal shall be eliminated by attrition.

5. One Detective Sergeant position will be eliminated by attrition.

6. If the "COPS in School" program is maintained at the current level, one juvenile officer position will be eliminated.

7. Up to 10% of the bargaining unit may be assigned to special duty assignments.

B. Organizational Structure and Scheduling. Scranton Police Department shall be modified organizationally, structurally, and functionally to ensure necessary cost containment, while ensuring the best possible service to the citizens of Scranton. The police department's existing shifts/platoons and the current organizational plan developed by the SIT Committee shall be modified to better reflect the temporal, demographic, and geographical conditions of the City.

Although the present collective bargaining agreement states that the Scranton Police Department shall consist of three "Divisions," the department is in fact comprised of four Divisions: Patrol, Detective, Administrative Support, and Training and Special Services.

Detective Division. The current distribution of manpower and supervisory oversight in the Detective Division shall be evaluated to minimize overtime and unnecessary call time. The City shall have the right to determine schedules based on such evaluation. The Director of Public Safety and the Chief of Police shall provide a new detective schedule no later than July 1, 2002 to be effective January 1, 2003. The resulting schedule may be altered at any time with 14 days notice or in case of emergency. A rotational "on call" plan shall be implemented to minimize the current use of overtime time/compensatory time off. No compensatory time off shall be paid to detectives for carrying a pager outside of duty hours.

Administrative Division. The Administrative Division consists of one sworn officer (a lieutenant) and a number of clerical positions located throughout the various organizational segments of the police department. These clerical positions shall be placed under the direct control of the organizational division where assigned. The Department's Grant Writer shall fall under the immediate direction, control, and supervision of the Chief of Police. The functional component of the Administrative Division shall be re-evaluated to determine if additional administrative/staff related duties should be included.

Training and Special Services Division. The Training and Special Services Division presently consists of two sworn officers—a Captain and a Sergeant. The Training and Special Services Division shall be eliminated and incorporated as a "Section" under the direct supervision of the Administrative Division Lieutenant. This Section shall consist of a Training Unit and a Special Services Unit. This change will result in the elimination of the position of "Training Captain" and ensure a more appropriately structured department. Each unit shall consist of one police officer with a rank of not to exceed sergeant. Such action will occur upon the retirement of present Administrative Captain.

Patrol Division. The present structure of the Patrol Division consists of three equally manned patrol shifts or platoons. This current method does not achieve a proper balance of manpower according to "shift activity." The current structure shall be changed to reflect the volume of police activity. An assignment schedule shall be designed to place officers on duty according to the amount of police activity and to reflect the functional, spatial, and temporal workload demands.

The present "Highway Unit" located within the Patrol Division shall be eliminated. Accident investigation and related duties shall be incorporated into the regular patrol function of the Division.

According to the International Association of Chiefs of Police, police activity in the average community generally occurs as follows:

22% night shift (12:00 a.m.–8:00 a.m.)

33% day shift (8:00 a.m.–4:00 p.m.)

45% evening shift (4:00 p.m.–12:00 a.m.)

Currently, manpower distribution in the Scranton Police Department

does not reflect the workload. Therefore, the three basic shifts shall be reorganized to better reflect police activity, as well as to improve response time and officer safety. In order to achieve a better balance, a fourth shift or "D" shift may be implemented. In addition, a limited "back drop" method may be employed to ensure adequate coverage at shift change. (The "back drop" method means that one or two patrol officers begin their respective shifts one hour before or after the remainder of their assigned platoon in order to ensure coverage at shift change.) This will also improve response time and result in minimal "shift change" overtime. Accordingly, the City shall have the sole right to determine both shift schedules and manpower per shift. No later than July 1, 2002, the Chief of Police and the Director of Public Safety shall determine the schedules and manpower requirements to be effective January 1, 2003. Such schedules may be altered at any time with 14 days notice or in case of emergency.

All minimum manning provisions are eliminated.

C. Assignment of Detectives: The City shall have the option to reinstate the midnight shift for one or more detectives if it deems it appropriate to provide needed service to the public. If the City chooses this option, it shall negotiate an appropriate rate of compensation for this position.

D. Drug and Alcohol Testing: In the 1996–2002 Agreement the parties had an incorporated Drug and Alcohol Testing program. The parties shall negotiate modifications to that program or, if they so choose, it may adopt the Drug and Alcohol Policy previously incorporated in the collective bargaining agreement covering employees in the Department of Public Works.

E. Other Assignments and Staffing: Subject to the express provisions of the Collective Bargaining Agreement (specifically Article I Section 2 of the 1996–2002 Collective Bargaining Agreement), including the obligations set forth in the incorporated SIT Agreement as amended, and as modified in Paragraph 4(B) hereof, the City shall have the right to determine the organizational structure and operation of the Department including the right to determine and change job duties for each position and the right to assign work to any employee. In the exercise of this right, the City shall not unreasonably or arbitrarily endanger the safety or health of bargaining unit members.

5. New Provisions

Sections II–B (6), (8) through (11) inclusive, (13) through (17) inclusive and (21) of the 2002 Recovery Plan applicable to all employees are incorporated by reference into this modified contract.

Sections II–B (2) through (7) inclusive and (9) of the 2002 Recovery Plan Provisions Specifically for the Police Department are incorporated by reference into this modified contract.

Except as modified by this Award, all other terms and conditions contained in previous awards and written agreements between the parties not modified by this Award shall remain as is. All other proposals and requests for change submitted by the City and the Association,

which have not been addressed herein, were considered denied.

With regard to the various items awarded or denied in this decision, the arbitration panel may not have been in unanimous accord on each; however, at least a majority of the arbitration board has concurred with each awarded item and to the denial of any others not included in this award.