29 A.3d 773

CITY OF SCRANTON, Appellee

v.

FIREFIGHTERS LOCAL UNION NO. 60, OF the INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL–CIO, Appellant

Commonwealth of Pennsylvania, Department of Community and Economic Development and Act 47 Coordinator for the City of Scranton, Intervenors.

City of Scranton, Appellee

v.

Fire Fighters Local Union No. 60, of the International Association of Fire Fighters, AFL–CIO, Appellant

Commonwealth of Pennsylvania, Department of Community and Economic Development and Act 47 Coordinator for the City of Scranton, Intervenors.

City of Scranton, Appellee

v.

E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police, Appellant

Commonwealth of Pennsylvania, Department of Community and Economic Development and Act 47 Coordinator for the City of Scranton, Intervenors.

City of Scranton, Appellee

v.

E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police, Appellant

Commonwealth of Pennsylvania, Department of Community and Economic Development and Act 45 Coordinator for the City of Scranton, Intervenors.

Supreme Court of Pennsylvania.

Argued Nov. 30, 2010.

Decided Oct. 19, 2011.

W. Timothy Barry, W. Timothy Barry & Associates, L.L.C., Canonsburg, for Act 47 Coordinator for the City of Scranton.

Clifford B. Levine, Pittsburgh, Alice Birmingham Mitinger, Cohen & Grigsby, P.C., for DCED & Act 47 Coordinator.

Stephen J. Holroyd, Philadelphia, Thomas W. Jennings, Jennings Sigmond, P.C., for Fire Fighters Local Union No. 60.

Stephen J. Holroyd, Philadelphia, Thomas W. Jennings, Jennings Sigmond, P.C., for Fire Fighters Local Union No. 1.

Stephen J. Holroyd, Philadelphia, Thomas W. Jennings, Jennings Sigmond, P.C., for E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police.

Irwin William Aronson, Harrisburg, Richard G. Poulson, Philadelphia, Willig, Williams & Davidson, for Appellant Amicus Curiae, PA AFL–CIO.

Joshua Martin Bloom, Joshua M. Bloom and Associates, P.C., Pittsburgh, for Appellant Amicus Curiae, International Association of Firefighters Local # 1.

Anthony Charles Busillo, Markowitz & Richman, Harrisburg, for Appellant Amicus Curiae, PA State Lodge Fraternal Order of Police.

Thomas Herman Kohn, Stephen C. Richman, Markowitz & Richman, Philadelphia, for Appellant Amicus Curiae, PA Professional Firefighters Association.

Bruce Michael Ludwig, Willig, Williams & Davidson, Philadelphia, for Appellant Amicus Curiae, Service Employees International Union, Local 668.

Amy Louise Rosenberger, Alaine S. Williams, Willig, Williams & Davidson, Philadelphia, for Appellant Amicus Curiae, American Federation of State, County and Municipal Employees.

Richard M. Goldberg, Hourigan, Kluger & Quinn, P.C., Kingston, Paul A. Kelly Jr., Mary T. Gardier Paterson, City Solicitors Office, Clarks Summit, for City of Scranton.

Kenneth M. Jarin, Ballard Spahr LLP, John Patrick McLaughlin, Ballard Spahr Andrews & Ingersoll, L.L.P., Philadelphia, Thomas David Rethage, Ballard Spahr LLP, for Appellee Amicus Curiae, Pa League of Cities & Municipalities, et al. in Nos. 35 MAP 2010 and 37 MAP 2010.

Kenneth M. Jarin, Ballard Spahr LLP, John Patrick McLaughlin, Commonwealth of Pa, Philadelphia, Thomas David Rethage, Ballard Spahr LLP, for Appellee Amicus Curiae, Pa League of Cities & Municipalities, et al. in Nos. 36 MAP 2010 and 38 MAP 2010.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice SAYLOR.

In these consolidated appeals, we address the effect of a municipal employer's financial distress and recovery planning on an interest arbitration award per the Policemen and Firemen Collective Bargaining Act.

For nearly twenty years, the City of Scranton has maintained the status of a distressed municipality under the Municipalities Financial Recovery Act.[1] Under Act 47, the City's financial affairs have been administered under various recovery plans with the assistance of—and oversight by—the Pennsylvania Economy League of Central PA, LLC, serving as a plan coordinator per an appointment by the Commonwealth's Department of Community Affairs (now the Department of Community and Economic Development ("DCED")). See 53 P.S. §§ 11701.221 (providing for the designation of Act 47 plan coordinators), 11701.241 (specifying requirements for an Act 47 recovery plan).

As concerns the initial (1993) recovery plan, it appears there was a fair amount of cooperation between the City and the labor organizations representing its firefighters and police officers—Appellants Local Union No. 60 of the International Association of Fire Fighters, AFL–CIO (the "IAFF"), and E.B. Jermyn Lodge No. 2 of the Fraternal Order of Police (the "FOP" and, collectively with the IAFF, the "Unions").[2]

---

1. Act of July 10, 1987, P.L. 246, No. 47 (as amended 53 P.S. §§ 11701.101–11701.501) ("Act 47"). See generally 53 P.S. § 11701.201 (setting forth the criteria by which the financial stability of municipalities is evaluated).

For a summary of Act 47, see Wilkinsburg Police Officers Ass'n ex rel. Harder v. Commonwealth, 535 Pa. 425, 427–28, 636 A.2d 134, 135–36 (1993).

2. From the Unions' perspective, at least, the prevailing circumstances at the time were follows:

However, over the years, as recovery efforts faltered, and with changes in City administration, the relationship between the City and the Unions deteriorated.

The City's second amended recovery plan—implemented in 2002—interposed substantial cost containment measures addressing the City's deficit and debt, including various labor relations provisions applicable to employees, encompassing police officers and firefighters. Furthermore, this recovery plan reflects a manifest intention, on the City's part, for full enforcement of such terms and conditions. *See* Revised and Updated Act 47 Recovery Plan for the City of Scranton, Ch. II–B (May 16, 2002) (the "Recovery Plan" or the "Plan") ("[T]o the extent that the City is unable to reach agreement with any of its Unions, resulting in interest arbitration or other legal proceedings, it is the express intention of the City that *the implementation of these cost containment provisions is mandatory.*" (emphasis added)). Notably, however, the Plan did allocate some funding toward upward adjustments in personnel-related costs, albeit there was an associated prohibition against retroactive changes.[3]

> Recognizing the City's need for economic relief, the Union agreed to a number of significant concessions. For example, the Union agreed to a significant reduction in manpower, and agreed to the civilianization of functions which had traditionally been exclusively performed by police officers. The Union also agreed to what was essentially a wage freeze, as the contract provided only one increase during the three-year term. In addition, the Union agreed to a significant reduction in the rate of pay for new hires, reduced the amount of vacation and sick time which could be accumulated, and agreed to a substantial reduction in the quality of health care coverage. (R.R. 450a–465a).

Brief for FOP at 10; *accord.* Brief for IAFF at 8–9. At the very least, it is clear that the cooperation and conciliation between the City and the Unions was substantially greater in this time period than at present.

3. The relevant terms are as follows:

> *Personnel Costs.* For 2003 a total of $225,000 will be available to meet any adjustments in personnel-related costs for all City employees, including those costs resulting from collective bargaining, arbitration, and/or other means; for 2004 a total of $400,000 will be available to meet the cost of any such adjustments; and for 2005 a total of $605,435 will be available. Distribution of these moneys among the various departments/bargaining units shall be fair and equitable and shall generally be in proportion to the actual 2001 costs

The most recent collective bargaining agreements between the City and the Unions expired at the close of 2002. Negotiations as to future terms and conditions of employment for members of the Unions resulted in impasses. Accordingly, pursuant to the Policemen and Firemen Collective Bargaining Act,[4] panels of interest arbitrators were selected to establish appropriate terms and conditions. *See* 43 P.S. § 217.4(b) ("The board of arbitration shall be composed of three persons, one appointed by the public employer, one appointed by the body of policemen or firemen involved, and a third member to be agreed upon by the public employer and such policemen or firemen."). Both Unions appointed Thomas W. Jennings, Esquire; the City selected Kenneth Jarin for the IAFF case, and Timothy P. O'Reilly, Esquire, for the FOP case; and the neutral arbitrators were Ralph H. Colflesh, Jr. and Alan A. Symonette, Esquire, respectively.

Throughout the arbitrations, the City maintained that the arbitrators lacked legal authority to award relief impinging upon the Recovery Plan. In this regard, the municipality relied on Section 252 of Act 47, which provides:

A collective bargaining agreement or *arbitration settlement* executed after the adoption of a plan shall not in any manner violate, expand or diminish its provisions.

53 P.S. § 11701.252 (emphasis added). At the center of their dispute, the parties differed as to whether an Act 111 arbitration *award* is an "arbitration settlement" for purposes of Section 252.

Hearings before the arbitrators continued into 2004, and divided awards were issued in the spring of 2006. These

incurred for each department/bargaining unit. Uses of these moneys could include one-time bonuses, wage adjustments, offsets against medical co-pays, etc. as determined by collective bargaining, arbitration, or other means. Whatever the terms of future collective bargaining agreements, arbitration awards, etc., no back wages or other retroactive adjustments shall be paid.
Recovery Plan, Ch. II–B(3).

4. Act of June 24, 1968, P.L. 237, No. 111 (codified at 43 P.S. §§ 217.1–217.10) ("Act 111").

pertained to the five-year period covering January 2003 through December 2007.

In both awards, the panel majorities recognized the City's financial distress and the remedial measures implemented by the Recovery Plan. The majorities concluded, nonetheless, that compensation of City public-safety employees was significantly lower than the wages and benefits afforded to others throughout the state. The panel majorities awarded: lump sum bonuses to police and fire personnel of $1,000 for 2003, $1,000 (firefighters) and $1,220 (police) for 2004, and $1,250 (firefighters) and $1,500 (police) for 2005; salary increases of five and one-half percent as of the last day of 2005, three and one-half percent for 2006, and four percent for 2007; and adjustments of health insurance deductibles. Further, the awards provided health benefits for police and firefighter employees retiring after January 1, 2007, for five years. In the IAFF case, the majority opined that the changes would not violate the City's maximum health care costs permitted in Section II–B of the 2002 Recovery Plan.

Separately, the IAFF panel majority expressed substantial concern over the safety of firefighters, in light of the impending expiration of a long-standing floor of 150 such employees. *See In re Fire Fighters Local Union No. 60 IAFF & City of Scranton*, No. 14L 360 01805 02, *slip op.* at 3, 7 (Act 111 Award May 30, 2006). Accordingly, the majority abolished the 150–person department limit in the previous CBA and replaced it with various manning requirements.[5] The FOP

---

5. Parenthetically, the majorities understanding concerning how their awards related to the Recovery Plan differed as between the IAFF and FOP awards. In the IAFF case, the "entire Panel recognize[d] that the Plan, to the extent it is effective, must be followed by the City and this Panel as a matter of law." *Fire Fighters & City of Scranton*, No. 14L 360 01805 02, *slip op.* at 2. In the FOP case, however, the panel majority appeared to recognize that its award was at least in facial tension with the Plan, indicating:

This Award is intended to reflect the intent of the Recovery Plan even though the recommendations will not be followed to the letter. In this regard, the City points to § 11701.252 which provides that this award "shall not in any manner violate, expand or diminish [the Plan's] provisions." Nevertheless, a certain amount of flexibility is contemplated. Otherwise, a municipality subject to Act 47 can reach

majority allowed ten hour shifts, modified manning schedules, and addressed assignment of detectives and drug and alcohol testing.

In both matters, the City-appointed arbitrators dissented, complaining that the awards were inconsistent, in various respects, with the Recovery Plan and, therefore, were illegal. For example, the pointed dissent in the IAFF case included the following remonstration:

> Aribtrators Jennings and Colflesh, despite repeated references to the Plan at the hearings in this matter and during executive sessions, have blatantly disregarded the Recovery Plan and the importance of that Plan to the entire City of Scranton in order to lift the interests of a relative few City employees over those of the City as a whole.

*Fire Fighters & City of Scranton*, No. 14L 360 01805 02, *slip op.* at 2 (Jarin, K., dissenting).

In response, the Union-appointed arbitrator set out his opposite perspective by way of a concurring opinion. He explained that Act 47 was intended to provide a distressed municipality with an opportunity to recover, not "to be a permanent bludgeon to be used by municipalities to deny their employees a fair living." *Id.* at 1 (Jennings, T., concurring). The concurring opinion stressed the Unions' cooperative efforts in furtherance of recovery. *See id.* at 2 (indicating that Union members "willingly slashed their wages, their fringe benefits, their working conditions and even their very safety in an effort to help the City 'recover' its economic health"). Nevertheless, in light of the ensuing years throughout which the City maintained its distressed status, the author couched the recovery process as amounting to "little more than a cruel hoax." *Id.* He continued:

> impasse and impose terms without the processes afforded by Act 111. Rather Act 47 permits the municipality [to] amend the plain to coincide with the specific provisions of an interest arbitration award. See § 11701.249.
> *In re E.B. Jermyn Lodge No. 2 FOP & City of Scranton,* No. 14L 360 01807 02 RVB, *slip op.* at 3–4 (Act 111 Award Apr. 7, 2006).

> As the evidence before this Panel vividly demonstrated, the explicitly promised "help" from both the Pennsylvania Economy League and of the Commonwealth that was to be freely given in exchange for the unions' sacrifices and cooperation was totally illusory. Scranton quickly became the biggest client of the Pennsylvania Economy League. PEL was billing hundreds of thousands of dollars in fees for advice that no one was following and that was producing absolutely no discernable progress....
>
> The State was little better. With the exception of one transparently-political effort to compel the City's compliance with the Recovery Plan, the State wrote lots of memos, but did nothing to substantively achieve the goals of Act 47.

*Id.* at 2–3.

The concurrence recognized that, in recent years, the City achieved a financial surplus, but the author chided the administration for continuing to "l[ay] down the Recovery plan and insist[ ] that the Panel mindlessly follow its precepts." *Id.* at 6. The concurring author was particularly critical of the City's management of manning levels. For example, he indicated:

> Stated bluntly, while the City had a million dollars to spend on legal fees to fight its employees' efforts to make a decent, albeit modest, living, it has never spent a single penny to ascertain what level of fire fighting manpower is necessary to protect the safety of the fire fighters. Not once has anyone within [City] administration, within PEL or within the Commonwealth paused for a single moment and asked if the reduction in staffing that its budgets demanded would cost a fire fighter his life.

*Id.*

█  The City responded to the awards with petitions to vacate or modify, supported by both the Act 47 coordinator and DCED as intervenors. On its review, the common pleas court acknowledged the limited scope of judicial review of an Act 111 arbitration award, in the nature of narrow *certiorari*. *See City of Scranton v. E.B. Jermyn Lodge No. 2 FOP,* Nos. 06 CV 2255 & 3131, *slip op.* at 7–8 (C.P. Lackawanna, Jan. 15,

2008) [hereinafter *"Scranton v. FOP "*]. *See generally City of Phila. v. IAFF, Local 22*, 606 Pa. 447, 460–65, 999 A.2d 555, 563–65 (2010) (discussing narrow *certiorari* review). However, the court found that it was required to vacate the arbitration awards as in excess of the arbitrators' powers, since such determinations: did not conform to the City's Act 47 plan; would result in increased financial and operational burdens on the already distressed municipality; and, thus, would impede the effectiveness of the Plan on the City's recovery.[6]

In this regard, the court referenced *FOP ex rel. Havens v. Yablonsky*, 867 A.2d 658 (Pa.Cmwlth.2005) (*en banc* ), for the proposition that the General Assembly implemented Section 252 of Act 47 to afford municipalities the ability to limit the bargaining power of police and firefighter unions. *See id.* at 663. Further, it regarded *Wilkinsburg* as confirming that Act 47 is a constitutionally permissible limitation on labor-relations adjustments, such as Act 111 interest arbitration awards. *See Scranton v. FOP*, Nos. 06 CV 2255 & 3131, *slip op.* at 8–9 (citing *Wilkinsburg*, 535 Pa. at 435, 636 A.2d at 139 ("[E]ven if section 252 of Act 47 operates as a bar to prospective bargaining agreements or arbitration awards, . . . it would not violate Article III, Section 31 of the Pennsylvania Constitution[,]" relating to binding arbitration of collective bargaining disputes)). Finally, the court alluded to *City of Farrell v. FOP, Lodge No. 34*, 538 Pa. 75, 645 A.2d 1294 (1994), as additional support. *See id.* at 83, 645 A.2d at 1298–99 (indicating that terms of an Act 111 award in conflict with an Act 47 recovery plan "would potentially invalidate [the] arbitration award"). Succinctly, the common pleas court concluded, "Act 111 bargaining rights must yield to a Recovery Plan." *Scranton v. FOP*, Nos. 06 CV 2255 & 3131, *slip op.* at 10.

6. As relevant to the present appeals, labor arbitrators exceed their authority, and thus implicate judicial correction, if they direct a public employer to perform an unlawful act. *See Chirico v. Bd. of Supervisors for Newton Twp.*, 504 Pa. 71, 74, 470 A.2d 470, 472 (1983).

Broader facets of the excess-of-powers tier of narrow *certiorari* review are discussed in the Court's recent decisions in *City of Philadelphia v. IAFF*, 606 Pa. at 462–64, 999 A.2d at 564–65, and *DOC v. PSCOA*, 608 Pa. 521, 537, 540–53, 12 A.3d 346, 356, 358–66 (2011).

On further appeal, the Commonwealth Court, *en banc,* also deemed Section 252 to be controlling, reasoning as follows:

[Section 252] acts to prohibit a distressed municipal employer from voluntarily making concessions during collective bargaining which violate or diminish a recovery plan under Act 47. This express prohibition has an effect on interest arbitration awards, whether or not the term "award" is present in the text. This is because of the long-standing rule that an arbitration award may only require a public employer to do that which it could do voluntarily. *Washington Arbitration Case,* 436 Pa. 168, 259 A.2d 437 (1969). When an arbitration award goes beyond this limitation, it may be reviewed under the narrow *certiorari* standard for excess of the arbitrators' powers. *FOP v. Yablonsky.*

*City of Scranton v. Fire Fighters Local Union No. 60 IAFF,* 964 A.2d 464, 474 (Pa.Cmwlth.2009) (*en banc* ); *accord. City of Scranton v. E.B. Jermyn Lodge No. 2 FOP,* 965 A.2d 359, 365 (Pa.Cmwlth.2009) (*en banc* ); *see also Borough of Greenville v. IAFF Local 1976,* 952 A.2d 700, 702 (Pa.Cmwlth.2008) (adopting a common pleas court's reasoning that an interest arbitration award was subordinate to a recovery plan). In this regard, the Court cross-referenced *Pittsburgh Fire Fighters, Local No. 1 ex rel. King v. Yablonsky,* 867 A.2d 666 (Pa. Cmwlth.2005) (*en banc* ), which offered the following construction of Section 252:

Because Act 111 describes the collective bargaining process as including the entering into settlements by way of written agreement, and arbitration determinations as a last resort, we believe the General Assembly, in referring to collective bargaining agreements or arbitration settlements in Act 47, was referring to arbitration awards, whether it used the word settlement or determination.

*Id.* at 671, *followed by Scranton v. IAFF,* 964 A.2d at 474.

The intermediate court also observed that, under *Wilkinsburg,* even barriers to collective bargaining arrangements are constitutionally permissible. *See Scranton v. FOP,* 965 A.2d at 364; *Scranton v. IAFF,* 964 A.2d at 473, 488. Additionally, the court explained that only the Act 47 coordinator has the

authority to initiate amendment of City's recovery plan. Accordingly, it rejected the Unions' claim that the Act 111 award could serve as a mandate for the City to unilaterally amend the Plan to comply with the Award. *See Scranton v. IAFF*, 964 A.2d at 478; *Scranton v. FOP*, 965 A.2d at 368.

The Commonwealth Court also rejected the Unions' argument that inclusion of the mandatory cost containment provisions of the Recovery Plan would have the effect of essentially eliminating collective bargaining. The court acknowledged these provisions impacted the terms and conditions over which each union could bargain. Nevertheless, it relied on Act 47's design to limit the effect of bargaining on municipal recovery, explaining that Section 241 of the enactment specifically authorizes recovery plan provisions altering collective bargaining arrangements. *See Scranton v. FOP*, 965 A.2d at 366 (citing 53 P.S. § 11701.241(3)); *Scranton v. IAFF*, 964 A.2d at 475 (same).

After having so ruled, the Commonwealth Court discerned a void in the common pleas court's order, since the latter court had never specified which provisions of the arbitration award were vacated or explained how the Recovery Plan was to be incorporated into the terms of the award. The intermediate court then rejected the Unions' position that the proper remedy was a remand to an arbitration panel, indicating that "[g]iven the unconscionable delay during the arbitration process and the parties' unwillingness to streamline the issues for review, the common pleas court had good reason to decline the 'start-from-scratch' approach to modification." *Scranton v. IAFF*, 964 A.2d at 477; *Scranton v. FOP*, 965 A.2d at 367. Thus, the appellate court found it necessary to clarify the relations of the parties by modifying the orders of the common pleas court.[7] In doing so, it affirmed the health insurance adjustments as being consistent with the Plan; vacated three sets of bonuses, a wage increase, and portions of other wage

7. The court drew support for its intervention not only from the decisional law, but also from the Uniform Arbitration Act, 42 Pa.C.S. §§ 7301–7320. *See Scranton v. FOP*, 965 A.2d at 366–67; *Scranton v. IAFF*, 964 A.2d at 476–77.

increases as improperly "retroactive"; and otherwise provided for enforcement of the Recovery Plan, except as modified by the court's pronouncements concerning firefighter safety and police department administration. *See Scranton v. IAFF*, 964 A.2d at 478–88; *Scranton v. FOP*, 965 A.2d at 368–77. The Commonwealth Court's orders incorporated its analysis of the Plan and set forth its modifications to the awards. *See Scranton v. FOP*, 965 A.2d at 380–85; *Scranton v. IAFF*, 964 A.2d at 492–95.[8]

As their lead issue, the Unions maintain that, by its very terms, Section 252 of Act 47 applies only to "collective bargaining agreement[s]" and "arbitration *settlement[s]*." 53 P.S. § 11701.252 (emphasis added). The Unions stress the absence from Section 252 of the term "award," while explaining that this word evokes a distinct, straightforward, and universally-appreciated understanding in the domain of public-sector labor relations.

The Unions recognize that "award" also is not used specifically in Act 111. Nevertheless, they explain that, under Act 111's terms, where a matter proceeds through final and binding arbitration, the result is a "determination" or decision reflecting the award, 43 P.S. § 217.4(b). According to the bargaining units, all of these terms contrast sharply with the critical reference in Act 47 to arbitration "settlements." In this regard, the Unions relate, Act 111 repeatedly makes reference to "settlements" in the sense of voluntary accords, as contrasted with arbitral determinations, decisions, or awards.[9] Indeed, the Unions observe, final decision-making by Act 111 arbitrators only becomes necessary under the statute's express terms when the parties are "*unable* to effect

8. The ongoing history of these matters includes February 2009 arbitration awards, subject to review by the Commonwealth Court in *City of Scranton v. Fire Fighters Local Union No. 60 IAFF*, 8 A.3d 930 (Pa. Cmwlth.2010), and *City of Scranton v. E.B. Jermyn Lodge No. 2 FOP*, 8 A.3d 971 (Pa.Cmwlth.2010).

9. *See, e.g.*, 43 P.S. § 217.2 ("It shall be the duty of public employers and their policemen and firemen to exert every reasonable effort to *settle* all disputes by engaging in collective bargaining in good faith and by entering into *settlements* by way of written agreements and maintaining the same." (emphasis added)).

*a settlement."* 43 P.S. § 217.4(a) (emphasis added). Thus, in the Unions' view, in no respect can a settlement be treated as the legal equivalent of an arbitral award for purposes of Act 111.

The Unions also highlight the Legislature's specific references to "arbitration awards" in other statutes directed to fiscally distressed municipalities, for example, the Pennsylvania Intergovernmental Cooperation Authority Act for Cities of the First Class.[10] Significantly, the Unions explain, the PICA Act contains specific language coordinating financial planning per its provisions with Act 111 arbitral "determination[s]"— which term, again, is used interchangeably with "decision[s]" and "award[s]." 53 P.S. § 12720.209(k). Therefore, according to the Unions, the omission of the terms decision, determination, and award from Section 252 was an exercise of legislative will, not inadvertence, reflecting the General Assembly's considered judgment not to intrude upon the interest arbitration process.

The Unions further observe that Act 47 itself reflects the Legislature's awareness of the pertinent labor-law terminology, as, for example, its Section 408 specifically refers to "arbitration award[s]." *See, e.g., id.* § 11701.408(a) (addressing consolidation of economically nonviable communities and the effect of such mergers on collective bargaining agreements and "arbitration award[s]"). According to the Unions, "[i]n light of the legislature's unmistakably explicit reference to 'arbitration awards' in Section 408 of Act 47, any assertion that the legislature somehow inadvertently excluded that very same term from Section 252 of the very same statute rings hollow." Brief for IAFF at 23; Brief for FOP at 23. Furthermore, the Unions point to this Court's decision in *Commonwealth v. State Conference of State Police Lodges of the FOP*, 525 Pa. 40, 575 A.2d 94 (1990), *superseded by statute*, 71 Pa.C.S. § 5955, as additional support. There, this Court held

10. Act of June 5, 1991, P.L. 9, No. 6 (as amended 53 P.S. §§ 12720.101–12720.709) (the "PICA Act"). This legislation was designed to foster fiscal recovery for cities of the first class (*i.e.,* Philadelphia), *see* 53 P.S. § 12720.102, and contains various provisions specifically addressing labor relations. *See, e.g., id.* § 12720.209.

that, since the provision of the State Employees' Retirement Code restraining collective bargaining in the context of such code's subject matter made no reference to arbitration awards, the statute had no impact upon such determinations. *See id.* at 44–45, 575 A.2d at 96–97.

Next, the Unions' submissions offer an extensive treatment of the history and policies underlying Act 111, including the early prohibitions against collective bargaining and self-help measures on the part of public-safety employees; resultant, destabilizing disharmony in the public-safety labor sector; and the promulgation of Act 111 in 1968 as a restorative and remedial measure.[11] The relevant passages of the Unions' briefs particularize the legislative response, discussing the conferral of the right to bargain, *see* 43 P.S. § 217.1; the compromise reflected in the maintenance of the prohibition against strikes while offering interest arbitration to provide a timely and final resolution of disputes, *see id.* §§ 215.2, 217.4(a); and Act 111's integral restrictions on judicial review of interest arbitration awards, *see id.* § 217.7. *See* Brief for IAFF at 38 (explaining that "the Legislature enacted Act 111 ... to provide a 'more perfect balance' between depriving vitally necessary employees of the right to strike and affording them a meaningful voice in their economic futures"); Brief for FOP at 38 (same). *See generally Smith,* 559 Pa. at 591–92, 741 A.2d at 1251–52; *PSP v. PSTA (Betancourt),* 540 Pa. 66, 76–78, 656 A.2d 83, 88–90 (1995).

The Unions believe their position that Act 47 recovery plans do not thwart interest arbitration is strongly supported by such history and policy. According to the Unions:

> The Pennsylvania legislature made a promise in 1968 to fire fighters and police officers to 'severely limit' judicial review of their Act 111 awards in exchange for, and in recognition of, the extremely dangerous jobs that they perform. It

11. *See* Brief for FOP at 42 (citing *PSP v. PSTA (Smith),* 559 Pa. 586, 591, 741 A.2d 1248, 1251 (1999) (explaining that a "double denial of rights to police and fire personnel fueled the growing tension between labor and management, tension which culminated in 'illegal strikes and a general breakdown in communication between public employers and their employees'" (citation omitted))); Brief for IAFF at 42 (same).

kept that promise in 1987 when it carefully, intentionally and logically insisted that any lawful Recovery Plan be "consistent" with "applicable law" and then limited the scope of Section 252 of Act 47 to only precisely and exactly what it states—a "collective bargaining agreement or arbitration settlement." To simply assume that the Legislature was unaware of, or simply ignored, forty years of "severe limitations" serving the "linchpin" of Act 111 as articulated by numerous decisions of this Court does a disservice to that legislature and this Court's relentless effort to protect and foster the oft-stated legislative intent of Act 111.

Brief for IAFF at 47; Brief for FOP at 46–47.

With regard to the *Wilkinsburg* and *City of Farrell* decisions, the Unions argue that the critical issue of statutory construction presented here simply was not placed before the Court in those cases. To the degree, then, that the Court assumed interest arbitration awards were subject to Section 252, the Unions contend that such a bare assumption should not be treated as controlling.[12] Regarding the Commonwealth Court's *Yablonsky* decision, the Unions criticize its rationale as superficial, non-textual, and unsupported by precedent.[13]

In rejoinder to the Commonwealth Court's position that award-based recovery plan departures entail illegal acts, the Unions develop that Act 47, by its terms, provides that a recovery plan "shall be consistent with applicable law." 53 P.S. § 11701.241. It is the Unions' position that the time-honored labor dispute resolution procedure embodied in Act 111 comprises just such law.

12. *See, e.g.,* Brief for FOP at 29 n. 12; Brief for IAFF at 34 (*"Wilkinsburg* was decided in a factual vacuum without the benefit of an actual award and *City of Farrell* involved but one issue—a relatively minor difference in wage increases. As a consequence, a full review on this critically important labor law issue has not been made or issued by this Court.").

13. *See, e.g.,* Brief for IAFF at 31 ("To simply ascribe a bare 'belief' that the Legislature intended to use the phrase 'arbitration award' in Section 252 of Act 47, but simply negligently forgot to unmistakably include it in Section 252 *as it did* in Section 408 of the same law, is to unfairly question that legislative body's essential competence and perilously approaches ... judicial lawmaking[.]" (emphasis in original)); Brief for FOP at 31 (same).

Finally, as *amici curiae* for the Unions, a group of other labor organizations offers the following overview perspective:

> In the over twenty years since Act 47's passage, municipal employers have grown increasingly sophisticated in their development and utilization of Recovery Plans to hurt public employees. In this litigation, an Act 47 Plan Coordinator worked in concert with the City of Scranton to develop plan recommendations specifically intended to slash wages, benefits, work rules and safety protections that were the product of decades of collective bargaining by the City's police officers and fire fighters. The Plan recommendations were then presented to the employees in a "take it or take it" fashion. There was no bargaining; the concessions were mandatory. The parties, and even the Act 111 interest arbitration panels charged with resolving their negotiations, were relegated to the role of rubber stamps.
>
> The lower courts' interpretations of Act 47 completely ratified this deliberate attack on the collective bargaining rights of Scranton's police officers and fire fighters, and in doing so granted the City of Scranton and any other Act employer an extraordinary and unprecedented ability to bypass collective bargaining. . . . As a matter of public policy, the lower courts' decisions dramatically upset the 40–year balance of leverage in public sector bargaining in favor of management, and in so doing jeopardize the harmony and cooperation that Pennsylvania's legislature and courts have deemed essential for the successful and efficient performance of the critically important work carried out by police officers and fire fighters.

Brief for *Amici* Pa. Professional Firefighters Ass'n, *et al.* at 3–4.[14]

The City,[15] on the other hand, finds the *en banc* Commonwealth Court's decision to be well reasoned in treating Act 47

14. The remaining *amici* submitting this brief are: Pennsylvania State Lodge, FOP; AFSCME; Service Employees International Union Local 668, CTW; Pennsylvania AFL–CIO; and IAFF Local No. 1.

15. The City's brief is filed jointly on its behalf, as well as on the behalf of DCED and the Act 47 Plan coordinator.

and associated recovery plans as legislative restrictions on Act 111 arbitral authority. The City maintains that this understanding comports with the language of Section 252, its purpose, rules of statutory construction, and prior judicial rulings such as *Wilkinsburg, City of Farrell,* and *Yablonsky.* Moreover, the City regards the Unions' argument invoking Section 252's incorporation of "applicable law" as "obviously circular" and disharmonious with the background decisions.

In terms of policy, the City stresses Act 47's directed remedial aims; [16] the public importance of restoring the financial stability of ailing local governments; and the comprehensive nature of a recovery plan as the remedial vehicle. Further, the City delineates escalating hardships which may impact municipalities that are deficient in recovery planning and associated plan execution. *See, e.g.,* 53 P.S. § 11701.251(a) (reflecting the potential for withholding of Commonwealth funds from a non-compliant distressed municipality). According to the City, vindication of the Unions' position would be at the cost of devastatingly undercutting Act 47's restorative goal.[17] In this vein, the City also foresees strategic behavior or mischief on the part of bargaining units.[18] More broadly, the City regards the Unions' efforts as

16. *See generally* 53 P.S. § 11701.102(a) (declaring that Act 47 is intended "to foster fiscal integrity of municipalities so that they provide for the health, safety and welfare of their citizens ... [and] meet financial obligations").

17. *Accord.* Brief for *Amici* Pa. League of Cities & Municipalities, *et al.,* at 9 ("By diluting the interpretation of § 252 of Act 47 and eliminating the ability to control personnel costs as [the Unions] request, this Court would effectively render Act 47 a shell of its statutory manifestation.").

18. More specifically, the City contends:

If Section 252 applied only to "collective bargaining agreements" and not to any culmination of the arbitration process—including an arbitration award—an Act 47 municipal employer would never be able to achieve a negotiated collective bargaining agreement with its police and fire unions. Each and every public service union in each and every Act 47 "distressed" municipality would always demand arbitration and await an "arbitration award," knowing that this stratagem could negate all reasonable limitations set forth in the municipality's Act 47 recovery plan. Considering the claims of each single union, individually, the various arbitration panels could eviscerate—in the context of their single awards—the comprehensive

reflecting a prioritization of the pecuniary interests of limited groups of public employees above the interests of the citizenry at large. In this regard, the City also contrasts its expansive public responsibilities, and those of the Plan coordinator, with the more limited charge of a panel of arbitrators considering only a single collective bargaining relationship.

Consistent with the Commonwealth Court's rationale, the City maintains that neither Act 47 nor the Recovery Plan eliminates Act 111's scheme of collective bargaining and interest arbitration. Rather, the City explains, the impact is limited to financially distressed municipalities, and, even as to such entities, bargaining and arbitration may proceed within the parameters established by recovery planning. *Accord. Yablonsky*, 867 A.2d at 671.

In terms of the decisions, in light of the supportive passages of *Wilkinsburg* and *City of Farrell*, the City invokes the presumption of correctness arising from apparent legislative acquiescence in an interpretation of a statute by this Court. *See* 1 Pa.C.S. § 1922(4). Further, the City distinguishes the *State Conference* decision, relied upon by the Unions, since the relevant statute referred only to "collective bargaining agreements" and not also to "arbitration settlements" as does Section 252. *See State Conference*, 525 Pa. at 46, 575 A.2d at 97. The City also believes the Legislature's swift counter-response to the holding in that case favors its position, and not that of the Unions.[19] The City also references *Borough of Ellwood City v. Ellwood City Police Department*, 573 Pa. 353, 825 A.2d 617 (2003), as reflecting the subordination of Act 111 to other cost-containment legislation. *See id.* at 364–65, 825

plan for recovery reflected in the municipality's recovery plan, placing the interests of the single union above those of entire communities. Nothing could more effectively defeat the entire statutory scheme of Act 47 than the limited view . . . that the union would have this Court adopt.
Brief for the City (FOP) at 27.

19. *See, e.g.,* Brief for the City (FOP) at 29 n. 18 ("It is ironic that the union would cite *State Conference* when the Legislature very quickly amended the statute at issue in that case to address the Court's interpretation where, here, the Legislature has not amended Act 47 to correct the Court's determination in *Wilkinsburg* and *City of Farrell*.").

A.2d at 623–24 (holding that mandatory statutory pension funding requirements, to be enforced "notwithstanding any [contrary] provision of law" trumped inconsistent terms of an Act 111 collective bargaining agreement).

The brief submitted by *amici* for the City emphasizes the scale of the fiscal problems faced by local governments statewide; the inefficacy of traditional measures (increased taxes, borrowing, and expense deferral) in addressing large-scale, expenditure-driven, structural budgetary imbalances; the primary role of personnel costs in perpetuating such imbalances; and the effect on wider financial markets of local government distress. *See* Brief for *Amici* Pa. League of Cities & Municipalities, *et al.*, at 11–16.[20] The following passages offer a flavor for *amici's* competing, overview perspective:

[The Unions'] sole concern with Act 47, an otherwise comprehensive financial recovery statute, is the removal of their bargaining relationship with local governments from the remedial ambit of the Act, so that the large compensation increased historically enjoyed by police and fire employees will remain unthreatened.

*     *     *

Section 252 of Act 47 provides the only effective means for local governments to gain control of police and fire personnel costs, costs which ballooned through no fault of the distressed local governments as they were, prior to Act 47, subject to binding interest arbitration under Act 111, through which arbitrators enjoyed boundless discretion to make determinations setting police and fire compensation benefits.

*     *     *

The legal arguments proffered by Appellants would render Act 47 ineffective in stopping the downward fiscal spiral faced by so many local governments.... Personnel costs,

20. The other organizations serving as the City's *amici* are: the Pennsylvania State Association of Township Supervisors, the County Commissioner Association of Pennsylvania, the Pennsylvania State Association of Township Commissioners, and the Pennsylvania State Association of Boroughs.

particularly the costs of uniformed police and fire employ-
ees, are almost uniformly the most significant cost faced by
every local government.

\*     \*     \*

Elected officials in Pennsylvania's financially distressed lo-
cal governments need the ability to swiftly work with the
remedies granted them in Act 47 to gain control of their
finances in order to save jobs, continue services, and en-
hance the business climate in their local areas and, by
extension, collectively across the Commonwealth.

The [Unions'] arguments do nothing but create fractures in
Act 47's balanced remedial scheme, producing a gaping hole
that will provide Act 111 interest arbitrators and bargaining
representatives with a blank slate and the ability to ignore
and undermine Act 47, its purpose, remedies, and mandate.

Brief for *Amici* Pa. League of Cities & Municipalities, *et al.*,
at 5–6, 9–10. According to the City's *amici*, any weakening of
Act 47 will yield a "real travesty ..., with the result that
Pennsylvania's local governments—including the members of
the Amici Curiae organizations—will ultimately be forced to
precipitously and continuously raise taxes on residents and
businesses and/or cut municipal services, or worse, file for
Chapter 9 bankruptcy." *Id.* at 7.

■ As reflected in the decisions of the common pleas and
intermediate courts, narrow *certiorari* governs our present
review, and we are concerned with the excess authority facet.
*See supra* note 6. Our reasoning is guided by the foundation
ably laid by the parties and their *amici*, centering on statutory
construction of Act 47's Section 252, and, more particularly,
the question of whether the Legislature intended its applica-
tion to Act 111 interest arbitration awards. The consideration
of this subsidiary legal question is plenary. *See, e.g., In re
Erie Golf Course*, 605 Pa. 484, 501, 992 A.2d 75, 85 (2010).

Preliminarily, we agree with the Unions that neither *Wil-
kinsburg* nor *City of Farrell* controls our decision here. As
the Unions observe, in neither opinion did the Court under-
take an examination of the term "arbitration settlement" as

used in Section 252. Moreover, nothing from either opinion suggests any dispute among the litigants as to this phrase's meaning. Thus, at the very most, the decisions reflect an assumption that Section 252 applies to arbitration awards, with no direct bearing on the outcome of the appeals.[21] Such a possible, non-dispositive assumption is in no way tantamount to a binding holding grounded on developed reasoning.[22] Furthermore, in such circumstances, we decline to invoke the presumption of correctness deriving from legislative inaction to obviate meaningful judicial review.

■ Upon our present consideration, in terms of Section 252's express terms, we find the term "arbitration settlement"

21. *See Wilkinsburg,* 535 Pa. at 435, 636 A.2d at 139 (*"[E]ven if* section 252 of Act 47 operates as a bar to prospective bargaining agreements *or arbitration awards,* ... it would not violate Article III, Section 31 of the Pennsylvania Constitution[,]" relating to binding arbitration of collective bargaining disputes (emphasis added)); *City of Farrell,* 538 Pa. at 83, 645 A.2d at 1298–99 (indicating that terms of an Act 111 award in conflict with an Act 47 recovery plan "would *potentially* invalidate [the] arbitration award" (emphasis added)).

The strongest indication in either of these cases of the Court's acquiescence in the notion that Section 252 impacts upon arbitration awards occurs in *City of Farrell,* where the Court expressed agreement with a perceived perspective of a dissenting intermediate-court jurist in this regard. *See id.* at 82, 645 A.2d at 1298 ("We agree with Judge Kelley ... that it is these [recovery plan] recommendations or 'provisions' that section 252 of Act 47 prohibits from being violated, expanded or diminished by the arbitration award." (citation omitted)). Again, however, *City of Farrell* offers no developed analysis of why an arbitration award would equate to an "arbitration settlement" under Section 252. Moreover, the salient observation was not directly relevant to the outcome of the appeal, since this Court ultimately determined that "the arbitration award in this case does not violate the provisions of Farrell's recovery plan" and "[t]hat is the end of the inquiry." *Id.* at 83, 645 A.2d at 1299.

22. *Cf. Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP,* 605 Pa. 269, 303, 989 A.2d 313, 334 (2010) (declining to treat a previous decision as controlling, where the relevant discussion was non-dispositive in terms of the outcome and, thus, the correctness of such discussion was not sharply in focus in the opinion); *Maloney v. Valley Med. Facilities, Inc.,* 603 Pa. 399, 418, 984 A.2d 478, 490 (2009) (" 'Judicial opinions are frequently drafted in haste, with imperfect foresight, and without due regard for the possibility that words or phrases or sentences may be taken out of context and treated as doctrines.' " (quoting *Nw. Nat'l Ins. Co. v. Maggio,* 976 F.2d 320, 323 (7th Cir.1992))).

to be ambiguous. On the one hand, the word "settlement" is commonly used, in general parlance and in law, to signify a voluntary compromise of disputes. *See, e.g.,* MERRIAM-WEBSTER DICTIONARY (2011) (defining "settlement," *inter alia,* as "an agreement compromising disputes"); BLACK'S LAW DICTIONARY 1405 (8th ed.1999) ("An agreement ending a dispute or lawsuit"). Moreover, as the Unions discuss, various of Act 111's references to "settlements" plainly evoke voluntary accords. *See, e.g.,* 43 P.S. § 217.2 (requiring public employers and their public-safety employees to exercise good faith efforts to enter into "settlements" in labor disputes).

On the other hand, courts often speak of matters being "settled" via adjudicative and/or quasi-adjudicative processes. In particular, in the arena of non-judicial dispute resolution, this Court has long spoken of "the settlement of disputes by arbitration." *See, e.g., Fastuca v. L.W. Molnar & Assocs.,* 608 Pa. 187, 213, 10 A.3d 1230, 1245 (2011). Along these lines, it is not inconceivable that the Legislature shorthanded such phrase, in Section 252, to "arbitration settlement." *Cf. City of Hartford v. Hartford Mun. Employees Ass'n,* 259 Conn. 251, 788 A.2d 60, 64–67 (2002) (adopting a similar construction relative to the term "grievance settlement," with reference to the labor-law convention "settlement of . . . disputes" by arbitration). As such, we find the term to be sufficiently ambiguous to warrant reference to tools of statutory construction. *See, e.g., Del. County v. First Union Corp.,* 605 Pa. 547, 557, 992 A.2d 112, 118–19 (2010) (discussing resort to statutory-construction principles where there is more than one reasonable interpretation of an enactment).

In this inquiry, we may consider, *inter alia,* the occasion and necessity for the statute; the object to be attained by the enactment under review; the consequences of specific interpretations; and the manner in which the Legislature would have likely intended for Act 47 to interact with Act 111. *See, e.g., DPW v. WCAB (Harvey),* 605 Pa. 636, 653, 993 A.2d 270, 281 (2010) (citing 1 Pa.C.S. § 1921(c)); *Del. County,* 605 Pa. at 558, 992 A.2d at 119. *See generally* 1 Pa.C.S. § 1921(a) (the

object of all statutory interpretation is to effectuate legislative intent).

Certainly, the City and its *amici* advance a forceful argument that the purpose of Act 47—alleviation of destabilizing financial distress of local governments—establishes a compelling public policy. Nevertheless, this Court has long recognized the also compelling public purpose underlying Act 111, namely, mitigation of the potential for disruptive labor strife among critical public-safety employees. *See Smith,* 559 Pa. at 591–92, 741 A.2d at 1251–52; *Betancourt,* 540 Pa. at 76–78, 656 A.2d at 88–90. Respectfully, it is our considered judgment that the arguments offered in support of the City's position afford too little weight to this latter policy, particularly in the claim that the Unions seek only to vindicate very limited interests. *See, e.g., supra* note 18. Rather, we agree with the Unions that the historic balance struck with the passage of Act 111 embodies a broader public policy. In this regard, it is noteworthy that the pitched interchanges among the arbitrators and between the litigants—as well as the great difficulty arising between the City and the Unions in accepting each other's good faith—hearkens back to the prevailing circumstances which prompted the Legislature to implement strong remedial measures in the public-safety labor relations arena. *See Smith,* 559 Pa. at 591–92, 741 A.2d at 1251–52; *Betancourt,* 540 Pa. at 76–78, 656 A.2d at 88–90.[23]

23. From our vantage, we do not question the good faith of either the City or the Unions. Both are obviously acting on strong and engrained beliefs tied to their own policy priorities, and we simply are not in a position to adjudge their bargaining and litigation conduct throughout their longstanding disputes. Instead, we operate on the general assumption that the parties will comply with their statutory obligation to proceed with good faith. *See* 43 P.S. § 217.2 ("It shall be the duty of public employers and their policemen and firemen to exert every reasonable effort to settle all disputes by engaging in collective bargaining in good faith and by entering into settlements by way of written agreements and maintaining the same."). Accordingly, we differ with the City's position that, if the Unions prevail, they always will prompt strategic impasses in bargaining to thwart the impact of Act 47 planning. *See, e.g., supra* note 18. *See generally City of Phila. v. IAFF,* 606 Pa. at 488–89 n. 2, 999 A.2d at 580 n. 2 (Saylor, J., concurring and dissenting).

There being no clear predominance of either of the strong and competing social policies in play, concomitantly, we find no overt policy-based answer to whether leverage for ailing municipalities or balanced labor relations in the local public-safety arena should prevail. Thus, at this juncture, we will proceed to evaluate the parties' additional contentions.

Regarding the City's reliance on *Yablonsky*, we attribute little weight to the decision. Its pronouncement that Section 252 applies to arbitration awards is explained in a single, rather oblique sentence. *See Yablonsky*, 867 A.2d at 671 ("Because Act 111 describes the collective bargaining process as including the entering into settlements by way of written agreement, and arbitration determinations as a last resort, we believe the General Assembly, in referring to collective bargaining agreements or arbitration settlements in Act 47, was referring to arbitration awards, whether it used the word settlement or determination."). Incongruously, the sentence's opening clauses distinguish between settlements and determinations, whereas the ensuing rationale relies upon the stated difference in equating the concepts. *See id.* Our sense is that *Yablonsky* rationale rests more on the notion that Section 252 must extend to arbitration awards to vindicate Act 47's policy objectives than upon a textual evaluation of Section 252 and/or Act 111. In this regard, however, we already have expressed our own discomfort with the idea that Act 111 policies intuitively must be subordinated to those of Act 47.[24]

In terms of Act 47's directive that a recovery plan "shall be consistent with applicable law," 53 P.S. § 11701.241, we do not agree with the City's portrayal of the Union's position that Act 111 constitutes applicable law as "circular" logic. *See, e.g.,* Brief for the City (FOP) at 34. Rather, the parties' arguments rise or fall on whether the Legislature intended Section 252 to apply to an arbitration award—if it did not, Act 111's

24. The *Ellwood City* decision cited by the City adds little to the discussion, other than to confirm that the Legislature may choose to subordinate Act 111 measures to other objectives. *See Ellwood City*, 573 Pa. at 364–65, 825 A.2d at 623–24. Determining the degree to which it actually did so in the setting of Act 47 turns on other considerations.

prescriptions relative to such awards plainly comprise "applicable law" with which a recovery plan must reconcile.[25]

In the end, we agree with the Unions that the approach taken in the *State Conference* decision should prevail. In that case, the Court refused to extend a statute curtailing the effect of *collective bargaining* on pension rights to *arbitration awards*, pronouncing: "To adopt the [public employer's] argument would be to interject into [the operative statute] the phrase 'nor any arbitration award' . . . It is not only unnecessary, but it is impermissible, for us to rewrite the statute in such a fashion." *State Conference*, 525 Pa. at 46, 575 A.2d at 97.

Similarly, in the landscape of the present appeals, we conclude that the policies underlying Act 111 interest arbitration are too strong and engrained in Commonwealth public-sector labor law to be displaced by extrapolation or on account of an ambiguous reference. As in *State Conference*, it is our considered judgment that, if it is the legislative will to displace them, this should be conveyed in explicit terms. *See id.*[26] Such clarity is particularly important in a labor-relations environment in which, to all appearances, the result may be a perpetual upset of the historic balance achieved by Act 111. *See generally* Alaina C. Schroeder, *The Interplay Between The Municipalities Financial Recovery Act and the Policemen and Firemen Collective Bargaining Act: An Analysis of City of Scranton v. Fire Fighters Local Union No. 60*, 19

**25.** This clause also bears on the issue of the City's ability to legally comply with an award, as arbitrators only may direct a municipal employer to do what it could do voluntarily. *See DOC v. PSCOA*, 608 Pa. at 537, 12 A.3d at 356. A public employer has a broad ability to negotiate terms and conditions of employment prior to the commencement of a recovery plan. Thus, to the degree that Section 252 does not impact arbitration awards, in light Section 241's requirement of consistency with applicable law, a local government simply cannot plan itself out of award compliance.

**26.** We realize, as the City and its *amici* stress, that *State Conference's* substantive effect was of a short duration, since the Legislature soon acted to supersede it. *See* 71 Pa.C.S. § 5955. The result, nonetheless, was to confirm the Legislature's deliberation in subordinating the established and compelling policies underlying Act 111 in the evolving environment of increasing governmental cost restraints.

WIDENER L.J. 541, 552–54 (2010) (discussing the failure of Act 47 measures to remove the City from its entrenched status as a financially distressed municipality). As the Unions note, Act 47 itself demonstrates the Legislature's intimate familiarity with the salient labor-law terminology, *see* 53 P.S. § 11701.408(a), and the PICA Act provides an apt model for the manifestation of a design impacting interest arbitration determinations, *see supra* note 10 and accompanying text.

We hold that Section 252 of Act 47 does not impinge upon interest arbitration awards under the Policemen and Firemen Collective Bargaining Act.[27]

The orders of the Commonwealth Court are reversed, and the matters are remanded for reinstatement of the arbitration awards.

Justices BAER, TODD, McCAFFERY, and ORIE MELVIN join the opinion.

Justice EAKIN files a joining concurring opinion in which Justice BAER joins.

Chief Justice CASTILLE files a dissenting opinion.

Justice EAKIN, concurring.

I join the salient analysis of my colleague Justice Saylor.

During argument of this case, counsel candidly acknowledged that of approximately 25 cities that have "entered" Act 47 and its protections, only a handful have recovered to the point of leaving the protections of Act 47. The remaining cities have apparently found a home there; Scranton has been there nearly 20 years.

I do not propose to fault the cities or their leaders for this condition—the crutch-like aid of Act 47 can understandably lead to dependence, and extrication from a state of dependence can be difficult. However, Act 47 comes with a price, a

---

27. We also accepted review of several derivative and/or subsidiary claims advanced by the Unions, which need not be considered here in light of our decision that Section 252 does not apply in the first instance.

sacrifice by many, including the appellants here. When, as here, their sacrifice becomes *de facto* permanent, one must remember who is really paying the price.

In Pennsylvania, our first responders have had their ability to strike replaced by arbitration. The reasons for this are manifest, and arbitration has generally proved a workable substitute. However, if Act 47 were allowed to eliminate meaningful arbitration, unilaterally and permanently eviscerating the ability of workers to adjudicate legitimate issues, the consequences on many levels would not be acceptable.

I believe Justice Saylor's reasoning is analytically correct; I also believe that result is the just one, and join the holding that § 252 does not supersede Act 111 arbitration awards.

Justice BAER joins this concurring opinion.

Chief Justice CASTILLE, dissenting.

Respectfully, I dissent. I view this as a close case, and Mr. Justice Saylor has accurately described the competing positions, and has expressed a cogent analysis. For my part, however, I would affirm the Commonwealth Court's decision that Section 252 of the Municipalities Financial Recovery Act ("Act 47")[1] applies to awards in Policemen and Firemen Collective Bargaining Act ("Act 111")[2] interest arbitration, albeit on different grounds.

In my view, the term "arbitration settlement," as used in Section 252, includes an Act 111 arbitration award. I am persuaded that the General Assembly intended this interpretation by a reading of Acts 47 and 111 *in pari materia;* by the objective to be attained by Act 47; by the presumption in favor of the public interest over the private interest; and by the consequences of the contrary interpretation. *See* 1 Pa. C.S. §§ 1921, 1922, 1932.

1. Act 47 of July 10, 1987, P.L. 246. *See* 53 P.S. §§ 11701.101–11701.501.

2. Act 111 of June 24, 1968, P.L. 23. *See* 43 P.S. §§ 217.1–217.10.

The Majority determines that Section 252 of Act 47 does not impinge on Act 111 interest arbitration awards, and remands to the Commonwealth Court for reinstatement of the 2003–2007 awards to the fire fighter and police unions ("Unions") in the City of Scranton ("City").  Section 252 states that "[a] collective bargaining agreement or **arbitration settlement** executed after the adoption of a plan shall not in any manner violate, expand or diminish its provisions."  53 P.S. § 11701.252 (emphasis added).  The Majority finds that "arbitration settlement" is an ambiguous term which is distinguishable from an arbitration award in the context of Act 47.  In the Majority's view, the reference to "arbitration settlement" in Section 252 and extrapolations from Act 47 and the caselaw do not convey a clear legislative intent to displace the strong policies underlying resolution of labor disputes via Act 111 interest arbitration.  For vindication of the City's position, if there is to be vindication, the Majority leaves it to the General Assembly to amend Section 252 and explicitly include Act 111 arbitration awards within the ambit of legal relations affected by Act 47.

I agree that the term "arbitration settlement" in Section 252 of Act 47 is ambiguous and that application of the rules of statutory construction is therefore appropriate.  I also agree that one viable interpretation of arbitration settlement is as shorthand for "the settlement of disputes by arbitration."  Majority Op. at 46–47, 29 A.3d at 787.  Act 111 confirms it: police officers and fire fighters have "the right to bargain collectively with their public employers" and "the right to **an adjustment or settlement of their grievances or disputes** in accordance with the terms of [Act 111]."  43 P.S. § 217.1 (emphasis added).  I view an "arbitration award" as a term of art that, in labor relations, accomplishes an adjustment or settlement of grievances or disputes.  Reading "arbitration settlement" as encompassing an "arbitration award" in the context of Section 252 of Act 47, in my view, is not contrary to the plain meaning of the phrase, nor is it in conflict with its use in Act 111, as the term is simply descriptive.[3]

3. Similarly, the label "determination" also seems to be used descriptively.  *See, e.g.,* 43 P.S. §§ 217.4(b), 217.7(a).  The General Assembly

The Unions argue that the absence of the term "arbitration award" from Section 252 is conclusive regarding the General Assembly's intention to exclude such resolutions of contested arbitrations from Act 47 financial austerity plans. Yet, Act 111 also does not use this term of art, but, as the Unions explain, it certainly describes and bestows the right to binding resolution by arbitration of disputes with the public employer, as an offset for the prohibition against striking by police and firefighters. 43 P.S. §§ 217.4, 217.7(a), 215.2; *Pa. State Police v. Pa. State Troopers Ass'n,* 559 Pa. 586, 741 A.2d 1248, 1251 (1999); *see* Briefs of Unions at 40–41. Act 111 describes the goal or result of arbitration, *i.e.,* the award, alternately as "an adjustment or settlement of grievances or disputes" and as a "determination." *See, e.g.,* 43 P.S. §§ 217.2, 217.7. Both these phrases describe the resolution of an arbitration in more precise terms than "award." Act 47's use of these terms is, therefore, not surprising. In my view, a consistent reading of Acts 47 and 111 indicates that the term "arbitration settlement" should be read descriptively and broadly, to include resolutions of arbitration, whether negotiated or dictated by the arbitration panel.

Moreover, this interpretation of Section 252 is more congruent with the legislative purposes of Act 47. Act 47 provides for the adoption of a plan to alleviate the financial distress of a municipality meeting certain criteria. 53 P.S. § 11701.241. The stated intent of the General Assembly was to "[e]nact procedures and provide powers and guidelines to ensure fiscal integrity of municipalities" consistent with a public policy to "provide for the health, safety and welfare of their citizens; pay due principal and interest on their debt obligations when due; meet financial obligations to their employees, vendors and suppliers; and provide for proper financial accounting procedures, budgeting and taxing practices." 53 P.S. § 11701.102. Elected officials have the principal responsibility to choose "the priorities for and manner of expen-

has not provided any indication that the terms "determination" and "arbitration settlement" take a specialized or narrower meaning for the purposes of Acts 47 and 111, different from their common and approved usage in the English language.

ditures based on available revenues." *Id.* Thus, the object of Act 47 is to ensure fiscal integrity, which consists of meeting governing and financial obligations to all interested actors, *e.g.*, the citizenry, creditors, employees, vendors, suppliers. The General Assembly explicitly recognized that the failure of a municipality to ensure fiscal integrity adversely affects the health, safety, and welfare of citizens in the municipality and the Commonwealth. *Id.*

On balance, a distressed municipality's plan will cut costs to outpace stagnant or decreasing revenues. Public employees are explicitly affected, as Act 47 envisions changes in labor agreements and layoffs or furloughs. *See* 53 P.S. § 11701.241(3). As the City's *amici* point out, personnel costs are a significant expenditure for every local government, and a distressed municipality can make significant gains towards financial recovery by, *inter alia,* restructuring its labor agreements and reorganizing its personnel. The intent of Act 47 is to authorize and facilitate these actions, in this case, by the City. Like the Majority, I certainly recognize the importance of Act 111 in maintaining the historic balance between labor and municipal employers. But, Act 47 addresses circumstances of financial distress. I am not convinced that the General Assembly intended to charge elected officials with these difficult tasks, while simultaneously permitting certain discrete public employee unions to opt-out of terms with which they do not agree. It is precisely when the public employee unions and the municipal employer cannot agree that Act 47 provides elected officials with the tools needed to make necessary and difficult decisions. Act 47 clearly states that elected officials set priorities and direct expenditures. The contrary interpretation of Section 252 allows arbitrators to decide whether public employee unions should comply with the priorities and expenditure limits set by the distressed municipality plan. In my view, this interpretation is incompatible with the General Assembly's emphasis on elected officials' duties when an Act 47 plan is in effect.[4]

---

4. The Unions are understandably weary following nearly twenty years of financial austerity under the City's distressed municipality plan, and

Setting aside any allegations of bad faith, the pressures of financial austerity are prone to induce disputes between public employee unions and municipalities, and to result in an increase in disputed arbitrations and non-negotiated adversarial resolutions. It is counterintuitive that in those most difficult of periods, the General Assembly would retract its preference for a coordinated plan of financial recovery directed by elected officials, and permit both labor and the municipality to continue with business as usual.

It is also counterintuitive that the General Assembly would exempt certain stakeholders, *i.e.,* certain public employees, from the collective tightening of the belt and the strictures borne by all other municipal stakeholders under Act 47. Act 47 clearly signals the intent to involve all stakeholders in seeking to ensure the financial well-being of a municipality. *See* 53 P.S. § 11701.241. Furthermore, the Unions' opt-out from compliance with a distressed municipality's plan, like the City's here, would increase the financial burden on other municipal stakeholders. The interpretation of Section 252 proposed by the Unions is dissonant with both the stated intent of Act 47 and with the presumption to favor public interest over private interests. *See* 53 P.S. § 11701.102; 1 Pa.C.S. § 1922.

For these reasons, I agree with the unanimous decision of the Commonwealth Court that Section 252 of Act 47 is applicable here. Accordingly, I respectfully dissent.

---

permitting the City to direct collective bargaining terms to the Unions under these circumstances undoubtedly can lead to abuse. Act 47 is a statute intended to operate in times of emergency and it probably should have been drafted with a sunset provision. Nonetheless, I am persuaded that the General Assembly intended Act 47 to apply equally whether or not public employee unions agree with a distressed municipality's plan terms affecting collective bargaining. Moreover, the interpretation of Section 252 forwarded by the Unions and embraced by the Majority would prevail in the first year no less than the twentieth year, eviscerating any but the most diluted Act 47 plans.